SMITH, Justice,
for the Court:
On November 21, 1994, the Mississippi Commission on Judicial Performance filed a formal complaint charging Judge Frank Russell, circuit judge of the First Circuit Court District, with judicial misconduct. Judge Russell has served as a circuit court judge since 1984. The Commission charged that Judge Russell violated Section 177A of the Mississippi Constitution of 1890 as amended; Miss.Code Ann. §§ 47-5-110; 99-37-19; Lewis v. State, 414 So.2d 435 (Miss.1982) and Canons 1, 2A, 2B, 3A (1)(4) and 3(B) of the Code of Judicial Conduct.
The allegations of misconduct arise from the post-sentencing release of four (4) prisoners. A three-member panel heard the matter on August 7-8, 1995, and found that Judge Russell's conduct warranted a public reprimand. On May 12, 1996, the full Commission unanimously adopted the findings of the hearing panel and recommended a public reprimand and monetary fine of $ 1,500.00. Because the facts herein are relatively un-eontroverted and the statutes and case law very clear on the subject matter, this Court affirms the Commission.
STATEMENT OF THE FACTS
Onnie Phillips Calcóte detailed her story in a document titled “Mother’s Narrative” and forwarded the same to Luther T. Brantley and the Mississippi Commission on Judicial Performance (hereinafter “Commission”). Contained within the documents were details concerning the release of Robert Daniel Par-ham, who pled guilty to manslaughter in the 1990 death of Mrs. Calcote’s daughter, Cynthia Helen Calcóte. Calcote’s complaint and the accompanying letter began the inquiry into certain actions by Judge Russell.
*932 The Commission filed a formal complaint against Judge Russell on November 11, 1994 charging that Judge Russell committed judicial misconduct in violation of § 177A of the Mississippi Constitution of 1890; Miss.Code Ann. §§ 47-5-110; 99-37-19; Lewis v. State, 414 So.2d 435 (Miss.1982); and Canons 1, 2A, 2B, 3A(1), 3A(4) and 3B(1) of the Code of Judicial Conduct of Mississippi Judges. The charges against Judge Russell stem from the post-sentencing release of four inmates after the term of court during which they were sentenced. The Commission charged that Judge Russell, acting in his official capacity, entered both original and Nunc Pro Tunc orders which suspended the sentences of prisoners who were under the jurisdiction of the Mississippi Department of Corrections (hereinafter “MDOC”). Moreover, the Commission charged that Judge Russell entered these orders with full knowledge that he lacked both the authority and jurisdiction to do so.
On August 7-8,1995, a three-member panel conducted hearings at the Law Center in University, Mississippi. The tribunal members sitting for the Mississippi Commission on Judicial Performance included Honorable Billy Joe Landrum, Honorable Frank M. Coleman, and Erik M. Lowrey, Esq. Wyatt Collins and Luther T. Brantley, III represented the Commission at this healing. Thomas E. Childs, Jr. represented Judge Russell.
Judge Russell argued that he did not act in bad faith because he acted pursuant to Miss. Code Ann. § 47-7-47 (1972). Judge Russell testified that the methods utilized by him to release prisoners are common practice among other circuit judges in the state. This testimony was corroborated by many individuals who testified in depositions which were admitted into evidence. In addition, Judge Russell made a proffer of MDOC statistical information which detailed cases over the last five years wherein an inmate had been released after the expiration of 180 days.
The panel rendered its Findings and Conclusions of Law on March 8, 1996 wherein it concluded that the actions of Judge Russell constituted “willful judicial misconduct prejudicial to the administration of justice which brings the judicial office into disrepute” and recommended that Judge Russell receive a public reprimand. The facts and circumstances of each of the four cases before the Commission are set forth in the following summaries.
ROYCE KEMP
The first case upon which the Commission bases its charges is that of Royee Kemp. Kemp was tried and convicted of the murder of his mother in 1976 and on October 12, 1976, was sentenced to life in prison by then Circuit Judge Neal Biggers. This Court affirmed Kemp’s conviction on November 17, 1977. See Kemp v. State, 352 So.2d 446 (Miss.1977). Kemp was later paroled and remained free until May 2,1990. Kemp’s parole was revoked after Mike LaRue, Kemp’s parole officer, substantiated reports that Kemp had been using alcohol and was in possession of firearms in violation of Miss. Code Ann. § 97-37-5 (1972).
Despite the revocation by the Parole Board, Judge Russell entered an order on May 18,1990 which suspended the remainder of Kemp’s sentence and released him from jail. This order was entered on the court’s own motion. Three days later, on May 21, 1990, Judge Russell rescinded the May 18, 1990 order. However, on January 9, 1991, Judge Russell, again sua sponte, suspended Kemp’s sentence. After the Attorney General’s Office filed a Petition to Vacate Void Orders, Judge Russell, on June 7, 1991 ordered Kemp incarcerated.
Judge Russell argued that he took action in the Kemp case because he believed Kemp’s constitutional rights were violated. Judge Russell testified that he believed Mr. Kemp was charged with a crime which was impossible for Kemp to commit and that evidence of the “crime” had been acquired during an illegal search and seizure by parole officer Mike LaRue.
Judge Russell testified that the Sheriff of the county and two deputy sheriffs explained to him that while Kemp was in jail on a parole revocation charge, Mike LaRue, the parole officer, entered Kemp’s house without a search warrant. LaRue seized firearms located in the house and charged Kemp with *933 a violation of Miss.Code Ann. § 97-37-5. Judge Russell testified that he believed Mr. Kemp could not be charged with this crime “because at that time, in 1990, Mississippi did not have a law that made it against the law for a felon to possess a weapon.” In addition, Judge Russell testified that Kemp was being charged with “possession of a concealed weapon on his person ... at a time when the weapon was miles away from where Kemp was ... He was locked up in jail ... It wasn’t anywhere near his person, much less concealed in whole or in part on his person.” Thus, Judge Russell, entered the order suspending Kemp’s sentence. Judge Russell later testified “... [I]f I see a constitutional right being violated, if it’s in court or if it’s out here on the street, or someone is being abused, I’m going to do what I can to correct it.”
Judge Russell testified that law enforcement, the MDOC area supervisor, and the District Attorney agreed to Kemp’s release. Although the District Attorney would .not sign the order, he did not oppose it. However, Judge Russell admits that no hearing was conducted nor did Kemp’s attorney participate in the decision to release Kemp.
Sanford Whitehurst, a deputy sheriff in Alcorn county and Kemp’s uncle, gave deposition testimony regarding the Kemp matter. Whitehurst testified that Judge Russell stated that he would not take any action in the Kemp matter unless “everyone is involved” and at no time did Judge Russell state that he did not have the authority to suspend Kemp’s sentence. Harold Monroe, another deputy sheriff and court bailiff, also gave testimony. Monroe testified that it was he who initially approached Judge Russell about Kemp. However, Monroe testified that Judge Russell stated “he couldn’t do it ... Parch-man had to do it.”
Mike LaRue, Kemp’s parole officer, testified that he received a report from Kemp’s relatives that Kemp was drinking and had firearms. When he arrived at Kemp’s father’s home, Kemp appeared to be intoxicated, however, he gave LaRue verbal permission to search his house which was located about five to six miles away. When the key provided to LaRue did not work, LaRue entered the house by climbing through a window and found the firearms in a chest of drawers. Kemp’s parole was later revoked.
CHESTER SHOOK
Chester Shook pled guilty to two counts of possession of a controlled substance with intent to distribute on November 12,1993. On that same day, Judge Russell sentenced Shook to four years on one count and two years on the other, to run concurrently. After Judge Russell sentenced Shook to the penitentiary, he was inundated with telephone calls from Shook’s daughter, Pat Hall. Hall repeatedly called because she was concerned about her father’s mental and physical health while at Parehman.
Hall testified that she had spoken with Suzi Steiger, a case manager supervisor at Parehman, who conducts inmate evaluations and at times sends reports on inmates to judges throughout Mississippi. Steiger testified that Shook, a sixty-seven year old inmate, was not doing well mentally or emotionally while at Parehman and would better served by being released. Steiger testified that she urged Hall to contact Judge Russell.
On May 9, 1994, Judge Russell entered a nunc pro tunc order suspending Shook’s sentence. Judge Russell gave the orders to Shook’s daughter to be filed. Judge Russell consistently maintained that he acted pursuant to Miss.Code Ann. § 47-7-47. However, Judge Russell admitted that no mention of “shock probation” was made at the original sentencing hearing nor did the original sentencing order reserve the right to judicial review.
Judge Russell further testified that he suspended Shook’s sentence after he was informed by Hall that Shook had lost 30 pounds, was 67 years of age, and had a cancerous tumor. Judge Russell later confirmed this information by contacting Ms. Steiger at Parehman. In addition, Judge Russell testified that he consulted the Sheriff of Prentiss County, about Shook’s release. Like the Kemp ease, no hearings were held, nor was Shook’s attorney, consulted regarding this matter.
*934 JEFFREY BONDS
Jeffrey Bonds pled guilty to burglary charges in 1990 and was sentenced to serve seven years on April 3,1990 by Judge Thomas J. Gardner, III. Bonds was placed in the RID program and after successful completion of that program was placed on probation on September 7, 1990. Approximately three (8) years later, on August 17, 1993, Judge Russell revoked Bonds’ probation after Bonds was arrested and indicted on two additional counts of burglary. On January 10, 1994, Bonds pled guilty and was sentenced by Judge Russell to serve three years on each count. Judge Russell ordered that this time was to run consecutive to the original seven year sentence, resulting in a total sentence of ten years.
On April 7, 1994, Judge Russell entered a nunc pro tunc order which purported to correct the January 10, 1994 order to reflect that Judge Russell was “reserving judicial review for a period of 180 days.” This language was not included in the original sentencing order. On that same day, Judge Russell entered an order vacating Bonds’ sentences, including the original sentence on which Bonds had been sentenced by Judge Gardner. Bonds was then placed on probation by Judge Russell.
Judge Russell testified that he released Bonds due to the recommendations of many individuals. Judge Russell testified that the Sheriff, Circuit Clerk and two Supervisors of Tishomingo County appealed to him on behalf of Bonds because Bonds, while a trustee at the jail, had performed extensive service for the county during the 1994 ice storm. Judge Russell instructed Bonds’ attorney “to prepare the paperwork.” Again, Judge Russell testified that he acted pursuant to § 47-7-47. However, Bonds was ineligible for release under this statute because of his prior offenses.
Richard Bowen, Bonds’ attorney, gave deposition testimony which largely corroborated that of Judge Russell. Bowen testified that he did in fact prepare the orders as instructed by Judge Russell and on April 4, 1990, presented those orders to Judge Russell to be signed. Bowen further testified that no hearing took place, however he did make a special trip to Tupelo, Mississippi to present the orders to the judge.
Johnny Nunley, the former Sheriff of Tish-omingo County, testified that he approached Judge Russell about Bonds’ early release due to the work Bonds performed for the county during the ice storm. In addition to Nunley, Mike LaRue testified that although he was never consulted about Bonds’ release, he believed “it was probably in the best interest of everyone involved.” Lastly, Jim Pounds, an Assistant District Attorney who handled the Bonds matter, testified that he was not consulted about Bonds’ release and was not aware of the order until it was completed.
ROBERT DANIEL PARHAM
On December 1, 1992, Robert Daniel Par-ham pled guilty to manslaughter for the 1990 death of his girlfriend. On January 8, 1993, Judge Russell sentenced Parham to twenty years in the penitentiary with ten years suspended. On June 2, 1994, Parham was denied parole. However, on July 19, 1994, Judge Russell, sua sponte, entered an order releasing Parham from the penitentiary and placing him on supervised probation. Judge Russell again testified that he acted pursuant to § 47-7-47. Unlike the other cases, Judge Russell reserved the right to judicial review in the original sentencing order.
Judge Russell testified that he released Parham upon the recommendation of several individuals: Mississippi Department of Corrections case manager, Suzi Steiger, MDOC probation/parole officer, Doc Robbins, and MDOC psychiatrist, Dr. Stanley Russell. Judge Russell also consulted Assistant District Attorney Rob Coleman and MDOC probation officer, Betty White. Judge Russell testified that he spoke with Parham’s family members only after Parham was released.
Commission Hearing
On May 12, 1995, the charges against Judge Russell came before the full Commission. The Commission considered the Complaint and Answer; the Hearing Panel’s Findings and Recommendations, Judge Russell’s Motion for Rehearing, Objections to the Panel’s Findings and Conclusions, Motion to have the entire Commission recused, and Wigginton v. State, 668 So.2d 763 *935 (Miss.1996)(decided after the panel hearing) and Judge Russell’s argument that the panel had not given due consideration to his years of public service as a mitigating factor. The full Commission unanimously adopted the findings of the hearing panel as the finding of the Commission and supplemented those findings to specifically address Wigginton and mitigation arguments by Judge Russell.
The Commission stated that although Wig-ginton had not been decided when the panel hearing took place, “it has been the law in this state that a judge does not have the authority to suspend the execution of a sentence after it has been imposed.” The Commission, citing Denton v. Maples, 394 So.2d 895 (Miss.1981) and Harrigill v. State, 403 So.2d 867 (Miss.1981), stated that “Judge Russell clearly should have known he had no authority to release a felon unless there was a statute specifically authorizing him to do so.”
In addressing, Judge Russell’s defense of Miss.Code Ann. § 47-7-47, the Commission stated “... clearly the Commission is in a position to expect that the clear terms of the statute be followed.” Although, noting that the language of § 47-7-47 is “confusing”, the Commission found “unless one totally ignores the words ‘at the time of the initial sentencing only[1] it must mean that some provision must be made at the time of the original sentence to indicate that the defendant is being sentenced under the provisions of § 47-7-47.”
In addressing Judge Russell’s use of Nunc Pro Tunc orders, the Commission found that “he can not use the Nunc Pro Tune method to change a sentence he is otherwise prohibited from changing.” While recognizing Judge Russell’s argument that he acted in good faith, the Commission held “good motives do not justify a Judge’s performing unauthorized acts.” The Commission stated that “the code of conduct imposes a much greater duty on a judge than just demanding that he never act in bad faith” and concluded that Judge Russell should be publicly reprimanded and fined $ 1500.00. Aggrieved, Judge Russell appeals to this Court citing the following issues:
ISSUES
I. WHETHER THE COMMISSION HAD PROPER JURISDICTION.
II. WHETHER JUDGE RUSSELL’S CONDUCT VIOLATED § 177A OF THE MISSISSIPPI CONSTITUTION OF 1890.
III. WHETHER CIRCUIT COURT JUDGES HAVE INHERENT AUTHORITY OVER SENTENCING MATTERS.
IV. WHETHER JUDICIAL DISCIPLINARY PROCEEDINGS ARE CRIMINAL IN NATURE.
V. WHETHER THE COMPOSITION OF THE JUDICIAL PERFORMANCE COMMISSION IS UNCONSTITUTIONAL.
VI. WHETHER SANCTIONS IMPOSED UPON JUDGES DESTROY THE INDEPENDENCE OF THE JUDICIARY.
VII. WHETHER SANCTIONS IMPOSED UPON JUDGE RUSSELL REGARDING THE KEMP CASE ARE BARRED BY THE STATUTE OF LIMITATIONS.
DISCUSSION OF LAW
This matter is before this Court pursuant to Rule 10 of the Rules of the Mississippi Commission on Judicial Performance. Our standard of review is as follows:
This Court conducts de novo review of judicial misconduct proceedings, giving great deference to the findings, based on clear and convincing evidence, of the recommendations of the Mississippi Judicial Performance Commission. Mississippi Judicial Performance Com’n v. Peyton, 555 So.2d 1036 (Miss.1990); In re Collins, 524 So.2d 553 (Miss.1987); In re Inquiry Concerning Gamer, 466 So.2d 884 (Miss. 1985); In re Brown, 458 So.2d 681 (Miss. 1984). Although this Court considers the recommendations of the Commission, we are in no way bound by them and may also impose additional sanctions. Peyton, 555 So.2d 1036 (Miss.1990); Collins, 524 So.2d 553 (Miss.1987).
*936 Mississippi Com’n on Judicial Performance v. Milling, 651 So.2d 531, 535 (Miss.1995).
I. WHETHER THE COMMISSION HAD PROPER JURISDICTION.
Judge Russell argues that the Commission did not have proper jurisdiction as required by Rule 2 of the Rules of the Mississippi Commission on Judicial Performance and therefore could not impose sanctions upon him. Rule 2 specifically states “In the absence of fraud, corrupt motive, or bad faith, the Commission shall not consider allegations against a judge for making findings of fact, reaching a legal conclusion, or applying the law as he understands it.” In the ease sub judice, the Commission stipulated that there were no allegations of fraud or corrupt motive and therefore proceeded upon the “bad faith” prong of the Rule.
Judge Russell argues that the “record contains no evidence, let alone clear and convincing evidence, of bad faith.” This Court has defined bad faith as “[a] specific intent to use the powers of the judicial office to accomplish a purpose which the judge knew or should have known was beyond the legitimate exercises of his authority constitutes bad faith.” Mississippi Com’n on Judicial Performance v. Gunn, 614 So.2d 387, 390 (Miss.1993) (emphasis added). Thus, the issue before this Court is whether Judge Russell knew or should have known that releasing four felons from the custody of MDOC was beyond the legitimate exercise of his authority.
Judge Russell argues that at all relevant times he did not act in bad faith because he applied the law as he understood it. Moreover, Judge Russell argues if he had failed to act in these cases he would have violated Wigginton v. State, 668 So.2d 763 (Miss.1996) or the federal constitutional rights of the prisoners. Despite Judge Russell’s contentions, Wigginton had not been decided at the time Judge Russell entered orders releasing the prisoners and therefore, he could not have acted contrary to this Court’s holding in that case. Moreover, at the time Judge Russell entered the orders in the case sub judice, prior decisions of this Court clearly held that a circuit judge has no authority to suspend a sentence after the defendant has begun serving the sentence. See Denton v. Maples, 394 So.2d 895, 898 (Miss.1981); Miss.Code Ann. § 47-7-33. Thus, Judge Russell should have been aware that he exceeded his authority when entering the orders in the four cases at issue. As a result, there is ample evidence of “bad faith” which would satisfy this Court’s definition as set forth in Milling, 651 So.2d 531 (Miss.1995).
Onnie Calcote’s complaint and letter described the actions of Judge Russell in regard to the Robert Parham ease. Thus, the Commission was in receipt of a letter containing allegations that Judge Russell engaged in a course of conduct whereby he released felons after they had been convicted and sentenced to the Department of Corrections and after he had lost all jurisdiction. Because Mississippi law was clearly contrary, allegations of this nature were jurisdictionally sufficient to enable the Commission to proceed with an investigation. The Commission properly considered the allegations against Judge Russell. This issue is without merit.
II. WHETHER JUDGE RUSSELL’S CONDUCT VIOLATED § 177A OF THE MISSISSIPPI CONSTITUTION OF 1890.
Section 177A of the Mississippi Constitution of 1890 provides that upon recommendation of the Commission, this Court may sanction judges for “willful misconduct in office or conduct which is prejudicial to the administration of justice which brings the judicial office into disrepute.” This Court has defined “willful misconduct” as follows:
Willful misconduct in office is the improper or wrongful use of the power of his office by a judge acting intentionally, or with gross unconcern for his conduct, and generally in bad faith. It involves more . than an error of judgment or a mere lack of diligence. Necessarily, the term would encompass conduct involving moral turpitude, dishonesty, or corruption and also any knowing misuse of the office, whatever the motive. However, these elements are not necessary to a finding of bad faith. A specific intent to use the powers of the judicial office to accomplish a purpose *937 which the judge knew or should have known was beyond the legitimate exercise of his authority constitutes bad faith.
Willful misconduct in office of necessity is conduct prejudicial to the administration of justice that brings the judicial office into disrepute. However, a judge may also, through negligence or ignorance not amounting to bad faith, behave in a manner prejudicial to the administration of justice so -as to bring the judicial office into disrepute.
Mississippi Com’n on Judicial Performance v. Milling, 651 So.2d 531, 538 (Miss.1995).
A. Suspension of Sentences
Court has repeatedly held that “the only time a trial judge can suspend a sentence is immediately after the defendant is convicted and at the time the trial judge announces and imposes sentence.” Denton v. Maples, 394 So.2d 895, 898 (Miss.1981) “If no appeal is perfected and [the] defendant begins to serve the sentence imposed, the time has passed for the trial judge to sus-susthe sentence under § 47-7-33.” Id. Moreover, if a case is appealed to this Court and is affirmed, “[t]here is no authority in the circuit court, or indeed this Court, follow-followthe issuance of a mandate affirming the case, to modify a judgment and sentence theretofore imposed.” Harrigill v. State, 403 So.2d 867, 868 (Miss.1981). Later we indicat-indicatthat, after the term of court during which the defendant was sentenced has passed, “the circuit judge’s sole authority in the case was to determine whether or not all or a portion of the original suspended sentence should be revoked.” Campbell v. State, 430 So.2d 851, 853 (Miss.l983)(emphasis added). See also Lems v. State, 414 So.2d 435 (Miss. 1982). In light of our prior decisions, Judge Russell should have been aware that sus-susthe sentences in the instant cases was prohibited.
[4] the Kemp matter, Judge Russell suspended the remainder of a sentence origi-origiimposed during 1976. Although the time limit imposed by § 47-7-47 does not apply to Kemp because his conviction was prior to April 14, 1977, Kemp was clearly ineligible for release pursuant to § 47-7-47. Subsection (2)(a) expressly states that defen-defenwith prior convictions of crimes where a death sentence or life imprisonment is the maximum penalty ... or where the defen-defenhas been confined for the conviction of a felony ... or has been convicted of a felony involving the use of a deadly weapon is not eligible for earned probation.
Moreover, Kemp had been taken into custody for a parole violation involving weapons and alcohol. There was no motion by an attorney who represented Kemp and the District Attorney’s Office had refused to drop the weapons charges. Yet, Judge Russell, acting solely on his own after numerous ex parte communications with others, chose to suspend the remainder of Kemp’s original sentence.
Although Judge Russell repeatedly testified that “he felt he had an obligation to right a wrong” and that he believed Kemp’s constitutional rights had been violated, he simply had no legal authority to take the action that he did. Moreover, it appears that Judge Russell, in trying to protect Kemp’s constitutional rights, may have violated those same due process rights when he rescinded the May 18,1990 order and reincarcerated Kemp without notice or a hearing.
[5] the Chester Shook matter, Judge Russell sentenced Shook to the penitentiary for two counts of possession of a controlled substance on November 12, 1993. Again, with the use of a nunc pro tunc order, Judge Russell suspended Shook’s sentence follow-followex parte communications with Shook’s daughter, Pat Hall. Judge Russell argues that he acted pursuant to § 47-7-47[1] in sus *938 pending Shook’s sentence. This statute is clear: the circuit court may act “at the time of the initial sentencing only, not earlier than thirty (80) nor later than one hundred eighty (180) days after the defendant has been delivered to the custody of the Department of Corrections.” Judge Russell admits that no mention of “shock probation” was made during the original sentencing hearing. Moreover, the original sentencing order does not indicate that Judge Russell “reserved the right to judicial review” or any other language which would indicate that Judge Russell acted pursuant to § 47-7-47.
Judge Russell argues, citing Smith v. State, 580 So.2d 1221 (Miss.1991) that § 47-7-47 contains “awkward language.” While the language contained in this statute is not the epitome of clear drafting; it is obvious that some indication must be made at the time of the original sentencing. Moreover, each of the original sentencing orders in Smith contained the language “in the custody of the Miss. Dept, of Corrections under the terms and conditions of Miss.Code Ann., Sec. 47-7-47 (shock probation)_” Id. at 1222.
At the time of Shook’s sentencing, Judge Russell’s intent was clear: “Being well aware of your age and physical condition ... I think it will be a just and equitable sentence that you spend some time in the penitentiary.” However, Judge Russell again utilized the nunc pro tunc method to accomplish what had not been done at “the time of the original sentencing.” Like the Kemp matter, no hearings were held with regard to the release of Shook, nor was Shook’s attorney involved in the process. Judge Russell, after numerous phone calls from Shook’s daughter and advice from Steiger (MDOC), decided to grant this aging, ill prisoner a reprieve from Parchman. However, at the time Judge Russell decided to do so, he no longer possessed the authority.
In the Bonds matter, Judge Russell once again utilized a nunc pro tunc order to suspend a sentence. On January 10, 1994, Judge Russell sentenced Bonds to three years each on two counts of burglary. This time was to run consecutively to Bonds’ prior sentence of seven years for burglary ordered by Judge Thomas Gardner, III. However, on April 7, 1994, Judge Russell entered a nunc pro tunc order which purported to correct the January 10,1994 sentencing order to reflect that Judge Russell “reserved judicial review for a period of 180 days.” This language was not included in the original sentencing order, nor was any mention made of § 47-7-47 or possible suspension at the sentencing hearing. On that same day, Judge Russell, sua sponte, entered an Order Vacating Sentences and Placing Defendant on Probation. In this order, Judge Russell vacated both the sentence imposed by himself on January 10, 1994, as well as the sentence imposed by Judge Gardner on August 17, 1993, thus commuting those to time served and suspending the remainder. Judge Russell then placed Bonds on supervised probation for a three-year period pursuant to §§ 47-7-43; 47-7-35.
Judge Russell again argues that he acted in accordance with § 47-7-47. However, there was no mention of § 47-7-47 at the time of the original sentencing nor was Bonds eligible for earned probation pursuant to § 47-7-47 due to a prior felony conviction. Also, Judge Russell suspended not only his sentence for the 1993 charges, but that imposed by Judge Gardner. Miss.Code Ann. § 47-7-47(2)(b) explicitly states, “the author *939 ity granted in this subsection shall be exercised by the judge who imposed sentence on the defendant, or his successor.” Thus, Judge Russell simply could not act under the statutory authority of § 47-7-47. Moreover, Judge Russell admits: he acted due to ex parte communications with several individuals; that no hearing was held; and that no motion by Bonds’ attorney was made. Rather, the record reveals that Judge Russell instructed Bonds’ former attorney to draw up the Orders and present them.
The last and final matter in issue before us is the case of Robert Daniel Parham. Again, Judge Russell testified that he acted pursuant to § 47-7-47. Unlike the other cases, Judge Russell did reserve the right to judicial review in the original sentencing order and on July 19, 1994, Judge Russell, sua sponte, entered an order releasing Parham from the penitentiary. Parham was released only one month after he had been denied parole by the Parole Board.
Although Judge Russell reserved the right of judicial review in the Parham case, there was no indication at the time of the original sentencing that Judge Russell acted pursuant to § 47-7-47 nor did he act within the 180-day time period required by § 47-7-47. Judge Russell suspended Parham’s sentence eighteen months after Parham was sentenced and committed to the custody of MDOC. Again, Judge Russell admitted he released Parham following ex parte communications with others.
However, Judge Russell argues that once he recognized his error in the Parham matter, he immediately took corrective action. Specifically, Judge Russell argues that once the Attorney General’s office became involved and filed a Petition to Vacate Void Orders, he immediately rescinded the orders. A brief history of Judge Russell’s conduct in the Parham matter, presented in the timeline below, reveals otherwise.
TIMELINE[2]
January 8, 1993: Robert Daniel Parham sentenced to twenty years in custody of MDOC, with ten years suspended.
June 2, 1994: Parham’s request for parole was denied.
July 19, 1994: Judge Russell enters Order suspending the balance of the sentence of Parham, pending good behavior.
August 5, 1994: Order entered by Judge Barry Ford suspending sentence of Par-ham and placing Parham on supervised probation for (5) years.
November 21, 1994: Formal complaint filed against Judge Russell.
January 13, 1995: Judge Russell requests opinion from Attorney General re: § 47-7-47.
February 15, 1995: Petition to Vacate Void Orders filed by Office of the Attorney General regarding July 19,1994 and August 5,1994 Orders.
March 14, 1995: Order entered by Judge Barry Ford denying Petition to Vacate Void Orders regarding the August 5, 1994 order entered by Judge Ford.
September 26, 1995: Order by Supreme Court denying Petition for Writ of Mandamus and/or Other Appropriate Extraordinary Writ filed by Attorney General. Petition requested this Court to revoke or rescind certain orders entered in Parham case. Order requires hearing be held on Petition to Vacate Void Orders in circuit court within sixty days.
October 18, 1995: Order setting hearing for 11/8/95 filed.
November 1, 1995: Parham’s motion to intervene/for continuance.
November 6, 1995: Continuance granted.
November 21, 1995: Hearing set for December 4,1995.
November 30, 1995: Motion for continuance filed on behalf of Parham.
December 1, 1995: Order of continuance until further order of court.
December 13, 1995: Order by Supreme Court granting Edwin Snyder until 12/20/95 to file response.
*940 January 16, 1996: Order from Supreme Court setting hearing on Petition to Vacate Void Orders on or before January 26,1996 filed.
January 18, 1996: Order setting hearing for January 24,1996.
January 24, 1996: Parham files Motion to dismiss Petition to Vacate Orders.
February 1, 1996: Opinion/Order by Judge Russell following hearing on Petition to Vacate Void Orders. Judge Russell denied all relief sought by Attorney General.
Contrary to Judge Russell’s assertions during oral argument, he did not immediately take corrective action when called upon to do so by the Attorney General. Rather, the record below reveals that a Petition to Vacate Void Orders was filed by the Attorney General on February 15,1995. After numerous continuances, the Petition was finally heard by Judge Russell on January 24, 1996. And finally, on February 1, 1995, almost one year from the date the petition was filed, Judge Russell denied all relief sought by the Attorney General. It is sufficiently clear that even when Judge Russell was requested by the Attorney General to correct his actions and rescind the orders he did not immediately take action but rather allowed the case to continue for approximately one year after which he refused to rescind or vacate the orders.
B. Wigginton v. State
Judge Russell argues that this Court’s decision in Wigginton v. State, 668 So.2d 768 (Miss.1996) provides authority for his actions. Judge Russell interprets Wig-ginton to stand for he proposition that “a circuit judge has jurisdiction over a sentence, despite the fact that the 180 days described in § 47-7-47 has expired.” Further, Judge Russell invites this Court to clarify the “conflict” between Wigginton and earlier cases which suggest that a circuit judge has no such authority after the defendant has been sentenced. See Denton v. Maples, 394 So.2d 895 (Miss.1981); Harrigill v. State, 403 So.2d 867 (Miss.1981)..
A close review of Wigginton and our prior cases reveals no conflict. In Wigginton, we were called upon to consider the plight of Bryan Scott Wigginton, an inmate originally sentenced pursuant to § 47-7-47. At the time of sentencing, the circuit judge reserved the right to review Wigginton’s sentence for a period not exceeding 180-days, and upon the recommendation of MDOC, Wigginton was placed in the Regimented Inmate Discipline (RID) Program. Wigginton was involved in an altercation and placed into general population.
At a hearing held before the circuit judge, the matter of Wigginton’s removal from the RID program was brought to the attention of the court. After taking the matter under advisement, the trial judge concluded that he had “no authority to review the procedure of the Mississippi Department of Corrections when a state prisoner feels that his rights have been violated or he or she has not been afforded due process.” Wigginton at 764. This Court held “the circuit judge clearly has the authority to inquire into Wigginton’s sentence, and see if there was any basis at all for Wigginton’s removal from the program, and it remains discretionary with the circuit judge to determine whether or not Wiggin-ton’s sentence should be reviewed.” Id. at 765.
There are obvious distinctions between Wigginton and the cases under consideration. Foremost, the trial judge in Wiggin-ton complied with § 47-7-47 at the time of the original sentencing when Wigginton was committed to the RID program. Moreover, we did not hold in Wigginton that the circuit judge could release Wigginton, but rather that the judge could review Wigginton’s removal from the RID program to ascertain whether or not his due process rights had been violated by MDOC.
The situation in Wigginton is clearly different than what we are faced with today. Here, Judge Russell used nunc pro tune orders to suspend sentences and place prisoners on probation after the time of the original sentencing. In Wigginton we simply held that the trial judge who had initially committed a prisoner to the RID program could review the prisoner’s expulsion from that program in order to ascertain whether there was any basis for removal.
*941 Judge Russell also argues that Wig-ginton indicates that there is no 180-day time limitation on the right to review the sentence of an individual sentenced under § 47-7-47. We did not so hold. Rather, we stated that the circuit judge retained discretion as to whether or not to review Wiggin-ton’s removal from the RID program when that judge had initially sentenced Wigginton to shock probation/RID. We did not hold that a judge has unbridled discretion to review and suspend sentences regardless of the time limitations. To adopt this construction would be in direct conflict with § 47-7-47.
C. Ex Parte Communications
In each case at issue, Judge Russell admits to engaging in ex parte communications with various individuals suggested or requested the release of state prisoners. In the Royee Kemp matter, ex parte communications took place with the Alcorn County Sheriff and two deputies. In the Chester Shook ease, Judge Russell admits to speaking with Shook’s daughter on numerous occasions prior to releasing her father. In the Bonds matter, Judge Russell admits that he was approached by the Sheriff of Tishomingo County, the Circuit Clerk, and two Supervisors. Finally, in the Parham matter, Judge Russell testified he spoke with MDOC employees Steiger and Robbins and a MDOC psychiatrist, Dr. Stanley Russell. Judge Russell maintains that he spoke with Par-ham’s family members only after Parham was released.
“For a judge to merely listen to another person involved in pending litigation is a violation of Canon 3A(4).” Mississippi Com’n on Judicial Performance v. Chinn, 611 So.2d 849, 852 (Miss.1992). In Chinn, this Court was confronted with a similar situation. Chinn, a justice court judge, was accused of engaging in ex parte communications with the father of a defendant. These communications took place prior to Judge Chinn’s amending the sentences of defendants who had already served twenty-eight (28) days. After the communication, Judge Chinn released the defendants and placed them on probation. We held Chinn’s ex parte communication to be a clear violation of Canon 2B of the Rules of Judicial Conduct which states in pertinent part:
B. A judge should not allow his family, social, or other relationships to influence his judicial conduct or judgment. He should not lend the prestige of his office to advance the private interests of others; nor should he convey or permit others to convey the impression that they are in a special position to influence him.
In addition, we held that “Judge Chinn had no jurisdiction to change a sentence which a defendant had already begun serving.” Chinn at 854.
We are once again faced with a situation involving ex parte communications with individuals followed by the amendment or suspension of sentences already being served. Although Judge Russell argues that he did not act in bad faith, this makes such conduct no less violative of this Court’s holdings in Chinn and Gunn as well as Canons 3A(1) and 3A(4). See Mississippi Com’n on Judicial Performance v. Dodds, 680 So.2d 180 (Miss.1996).
In light of our holding in Chinn coupled with our prior decisions in such cases as Denton v. Maples, 394 So.2d 895 (Miss. 1981) and Harrigill v. State, 403 So.2d 867 (Miss.1981), Judge Russell’s conduct constitutes willful misconduct in office prejudicial to the administration of justice. Judge Russell either knew or should have known that many of his actions were beyond his authority and jurisdiction.
Alternatively, Judge Russell argues that § 177A of the Mississippi Constitution and the language of “bringing the judicial office into disrepute” is unconstitutionally vague. Judge Russell argues this language is so indefinite that persons of common intelligence must guess at its meaning, and differ as to its application. Specifically, Judge Russell argues that he had no reasonable notice that making judicial decisions in good faith constitutes conduct prejudicial to the administration of justice which brings the judicial office into disrepute within the meaning of § 177A. Judge Russell further argues that this Court has “never given any clarifying interpretation to the phrase ‘bring the *942 judicial office into disrepute.’ ” A brief review of prior eases reveals otherwise.
In Mississippi Judicial Performance Com’n v. Walker, 565 So.2d 1117 (Miss.1990), this Court held, “[t]here is no simple, black-letter definition of conduct prejudicial to the administration of justice which brings the judicial office into disrepute.” Id. at 1122 0quoting In re Inquiry Concerning Baker, 535 So.2d 47 (Miss.1988)). Moreover, this Court cited numerous decisions from our sister states which clarify the meaning language identical to that used in our Constitution. For example, the Nebraska Supreme Court, in In re Kneifl, 217 Neb. 472, 351 N.W.2d 693 (1984) stated the following:
Conduct which falls short of reaffirming one’s fitness for the high responsibilities of judicial office constitutes conduct prejudicial to the administration of justice that brings the judicial office into disrepute, [citation omitted]. It includes conduct which would justify a reasonable man in believing that a result achieved by a judge was achieved because of his position and prestige, [citation omitted] and conduct which would appear to an objective observer to be not only unjudicial but prejudicial to public esteem for the judicial office, [citation omitted]. It depends not so much on the judge’s motives but more on the conduct itself, the results thereof, and the impact such conduct might reasonably have upon knowledgeable observers, [citation omitted]. The “judicial office” refers not to the judge as an individual, but, rather, to the judiciary, [citation omitted]. Conduct prejudicial to the administration of justice that brings the judicial office into disrepute is less grave than willful misconduct in office, [citations omitted].
351 N.W.2d at 695-96.
The Maryland Supreme Court defined this language as follows:
Precisely what “conduct prejudicial to the proper administration of justice” is or may be, in any and all circumstances we shall not undertake to say. Indeed, a comprehensive, universally applicable definition may never evolve but it is unlikely we shall ever have much trouble recognizing and identifying such conduct whenever the constituent facts are presented.
In re Diener and Broccolino, 268 Md. 659, 304 A.2d 587 (1973), cert, denied, 415 U.S. 989, 94 S.Ct. 1586, 39 L.Ed.2d 885 (1974).
“When a statute can be interpreted either as constitutional or unconstitutional, we have long held that we adopt the constitutional construction, [citations omitted]. If possible, we will construe it so as ‘to enable it to withstand the constitutional attack and to carry out the purpose embedded in the [statute].’ ” Estate of Smiley, 530 So.2d 18, 22 {quoting Frazier v. State, 504 So.2d 675, 708 (Miss.1987)).
The language of § 177A and the interpretations of that language by this Court are sufficient to put men of common intelligence on notice of what type of conduct is prohibited. This issue is without merit.
D. Sanctions
“The imposition of sanctions is a matter left solely to the discretion of this Court.” Judicial Performance Com’n v. Walker, 565 So.2d 1117, 1124 (Miss.1990) (citations omitted). “This Court gives great deference to the recommendations of the Commission, but is not bound thereby.” Id. (citations omitted). “The sanctions available to this Court are: (1) removal from office; (2) suspension from office; (3) fine; and (4) public censure or reprimand.” Id. (citing Art. 6 § 177A, Miss. Const. (1890)). “The sanction involved ought fit the offense.” Id. (quoting In Re Bailey, 541 So.2d 1036, 1039 (Miss.1989)).
In the case sub judice, the Commission recommends that Judge Russell be publicly reprimanded, fined $ 1500.00 and taxed with all costs of this proceeding. This Court has held that “the sanction of public reprimand is imposed for more than one offense.” In re Inquiry Concerning Baker, 535 So.2d 47, 53 (Miss.1988). “In determining whether a reprimand should be public, this Court considers mitigating factors which weigh in favor of confidential, private action.” Judicial Performance Com’n v. Walker, 565 So.2d 1117, 1125 (Miss.1990). These seven factors were originally set forth by this Court in In *943 re Inquiry Concerning Baker, 535 So.2d 47, 54 (Miss.1988) and are set forth below.
(1) The length and character of the judge’s public service.
Judge Russell has served as circuit court judge for the First Circuit District of Mississippi since 1984. From 1980-1984, Judge Russell served as County Prosecuting Attorney for Itawamba county. Moreover, numerous character witnesses testified on behalf of Judge Russell. All were in agreement that Judge Russell was a fair and impartial judge who was well-respected in the community. Justice James L. Roberts of this Court also testified on behalf of Judge Russell.
(2) Positive contributions made by the judge to the courts and the community.
The record contains no information regarding this factor.
(3) The lack of prior judicial precedent on the incident in issue.
At the time Judge Russell took action in the four cases, Mississippi law was clearly set forth in Denton v. Maples, 394 So.2d 895 (Miss.1981), Lewis v. State, 414 So.2d 435 (Miss.1982) and Harrigill v. State, 403 So.2d 867 (Miss.1981). In addition, § 47-7-47 required that any action taken by circuit judges must occur at the time of the “initial sentencing only, not earlier than thirty (30) days nor later than one hundred eighty (180) days after the defendant has been delivered to the Department of Corrections.” Judge Russell either knew or should have known the limits of his authority.
(4) Commitment to fairness and innovative procedural form on the part of the judge.
Judge Russell presented many witnesses in the proceedings below, each of whom testified that Judge Russell is a fair and impartial judge who is well-respected.
(5) The magnitude of the offense.
The conduct at issue in the case sub judice is the post-sentencing release of state prisoners in excess of the judge’s authority. Moreover, Mississippi law clearly defined the limits of a circuit judge’s authority. This weighs heavily in favor of public reprimand.
(6) The number of persons affected.
Four prisoners were released from incarceration. Two of these individuals had taken the life of another and therefore families of those victims were affected by Judge Russell’s actions. Moreover, community perception of the actions taken is vital.
(7) Whether “moral turpitude” was involved.
Moral turpitude was not involved in this case.
Having weighed each factor, we are of the opinion that a public reprimand is warranted. This Court has repeatedly upheld public reprimands for cases involving “ticket firing” and abuse of contempt powers; both of which are examples of judges who act in excess of their authority. See Mississippi Com’n on Judicial Performance v. Gunn, 614 So.2d 387 (Miss.1993). Mississippi Com’n on Judicial Performance v. Chinn, 611 So.2d 849 (Miss. 1992).
Moreover, Judge Russell, when called upon by the Attorney General to take corrective action and vacate the orders entered in the Parham case, chose not to do so. Rather the case continued for almost one year after which Judge Russell denied all relief sought by the Attorney General. The totality of circumstances surrounding Judge Russell’s conduct supports the decision of the Commission and the recommendations thereof.
III. WHETHER CIRCUIT JUDGES HAVE INHERENT AUTHORITY OVER SENTENCING MATTERS.
This Court has held “[i]n the absence of some statute authorizing such modification, and presently there is none, once the case has been terminated and the term of court ends, a circuit court is powerless to alter or vacate its judgment.” Harrigill v. State, 403 So.2d 867, 868-869 (Miss.1981). *944 The language utilized by this Court in Ham-gill is clear that there is no inherent authority to alter or vacate a judgment, but rather legislation is required.
However, Judge Russell urges this Court to hold that circuit judges in criminal cases have this type of authority. Judge Russell relies on the adoption of the Mississippi Rules of Civil Procedure, specifically Rules 60(b) and 77(a), both of which allow for relief from judgment in civil cases upon meeting certain criteria. However, well-established legal principles do not suggest parallel authority in criminal cases, yet Judge Russell relies on our holding in Winder v. State, 640 So.2d 893 (Miss.1994). In Winder, we held that there was no violation of the 270-day rule where there was good cause shown for delay. Judge Russell argues that in effect this holding stands for the proposition that “circuit judges are not strictly bound by this time limitation and may hear criminal cases outside the 270-day period.” In light of Winder, Judge Russell urges this Court to hold that our opinion in Wigginton v. State stands for the proposition that the strict time limitations of § 47-7-47 are not compulsory.
In essence, Judge Russell calls upon this Court to define the limits of the circuit judge’s authority. We did so in Griffin v. ■ State, 565 So.2d 545 (Miss.1990) where we held that “[a] court can only act as specifically authorized by either the Constitution or by statute.” Id. at 547. Although, we recognized that “there has been a vast expansion by statutory enactment of the times within which circuit judges are lawfully empowered to conduct court affairs”, this Court held that “the passage of the next term of court deprived the circuit court of any further authority to reinstate [the convictions].” Id. at 550.
Therefore, if a court lacks the authority to reinstate the convictions and sentences handed down during a prior term of court, the converse must also be true: the circuit court lacks authority to suspend sentences after the term of court.
Judge Russell calls upon this Court to hold that circuit courts have inherent authority to consider sentencing matters in situations other than those meeting the requirements of § 47-7-47. In Aeroglide Corp. v. Whitehead, 433 So.2d 952 (Miss.1983), we held that circuit courts have the inherent authority to control proceedings before it and the conduct of those participating in such proceedings. We have also held that circuit courts have authority to impose sanctions against attorneys. However, this Court has not held that circuit courts have inherent authority over sentencing matters after the term of court ends.
In light of our precedent, there is no indication that circuit court judges have inherent authority to modify sentences after the end of the term of court during which the sentence given.
IV. WHETHER JUDICIAL DISCIPLINARY PROCEEDINGS ARE CRIMINAL IN NATURE.
Judge Russell argues that a judicial disciplinary proceeding is criminal in nature and therefore he is entitled to a trial by jury and the beyond a reasonable doubt standard of proof. Judge Russell argues that because this Court has previously held that bar disciplinary proceedings are “quasi-criminal” and thus subject to a “clear and convincing evidence” standard of proof, that this Court obviously considers judicial disciplinary proceedings to be “quasi-criminal.” Judge Russell relies upon Austin v. United States, 509 U.S. 602, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993), wherein the Supreme Court held that civil sanctions which are intended to punish are criminal in nature and therefore warrant criminal protections. More specifically, Judge Russell argues that the Supreme Court in Spevack v. Klein, 385 U.S. 511, 87 S.Ct. 625,17 L.Ed.2d 574 (1967) held that the Fifth Amendment privilege against self-incrimination was applicable to attorney disciplinary proceedings and therefore considered those proceedings criminal in nature.
This Court addressed the Spevack decision in Mississippi State Bar v. Attorney Respondent, 367 So.2d 179 (Miss.1979), where this Court held that the “precise holding of Spe-vack was that an attorney could not be disbarred solely for relying on his privilege against self incrimination and refusing to honor a subpoena duces tecum.” Moreover, *945 this Court held “[c]areful analysis of Spevack and In re Ruffalo [390 U.S. 544, 88 S.Ct. 1222, 20 L.Edüd 117 (1968)] shows that in neither case was it intended to create the inference that the Fifth Amendment or other constitutional rights were to apply with full force as in a criminal trial.” Id. at 184. We concluded that “[a] disciplinary proceeding held pursuant to a formal complaint filed by the complaints committee, while concededly having penal elements, is not a criminal case.” Id.
Although this Court has held that bar disciplinary proceedings are inherently adversary and of a quasi-criminal nature, we clearly held that “there are among the procedural trappings normally attendant upon a criminal trial numerous ‘rights’ which have no place in bar disciplinary proceedings.” Mississippi State Bar v. Young, 509 So.2d 210 (Miss. 1987). In Young, this Court specifically held “the attorney has no right to trial by jury.” Id. at 212. See also Asher v. Mississippi Bar, 661 So.2d 722 (Miss.1995). Further, this Court held, “the attorney’s ‘guilt’ need not be established beyond a reasonable doubt, as in criminal eases.” Id. at 213. (citing Jackson v. Virginia, 443 U.S. 307, 309, 99 S.Ct. 2781, 2783-84, 61 L.Edüd 560 (1979)).
This Court, in discussing the application of speedy trial factors to bar disciplinary proceedings, made the following statement:
First, the case sub judice is not a criminal case. The Respondent has a higher duty than does a criminal defendant. He is after all a lawyer, a member of the Bar and a person responsible to his clients, the Courts and Bar and finally responsible to the public at large! It is unseemly for a member of the Bar to assert and argue a criminal defense in a hearing concerning a professional misconduct charge.
Mississippi Bar v. An Attorney, 636 So.2d 371, 374 (Miss.1994). Judge Russell is also a member of the Bar and moreover occupies the position of a circuit court judge, he likewise has a higher duty than a criminal defendant. This issue is without merit.
V. WHETHER THE COMPOSITION OF THE JUDICIAL PERFORMANCE COMMISSION IS UNCONSTITUTIONAL.
Judge Russell next argues that the Judicial Performance Commission violates due process because the same attorneys investigate judicial complaints, give advice to the Commission and prosecute cases before the Commission. Judge Russell alleges that the Executive Director of the Commission, who is in charge of travel vouchers and expense accounts of the Commissioners, also renders advice to and prosecutes eases before the Commission. Judge Russell concludes that the Commissioners therefore have a financial interest in pleasing the Executive Director.
This Court has not directly addressed the issue of whether the combination of investigative, prosecutorial, and adjudicatory functions in the Commission of Judicial Performance violates due process. However, this Court has addressed the combination of these functions in other fora. See McGowan v. Mississippi State Oil & Gas Bd., 604 So.2d 312 (Miss.1992), cert, denied, 506 U.S. 1052, 113 S.Ct. 976, 122 L.Edüd 130 (1993); Harrison County School Bd. v. Morreale, 538 So.2d 1196 (Miss.1989); Dampier v. Lawrence County School Dish, 344 So.2d 130 (Miss.1977).
The United States Supreme Court stated “[t]hat the combination of investigative and adjudicative functions does not, without more, constitute a due process violation.” Withrow v. Larkin, 421 U.S. 35, 58, 95 S.Ct. 1456,1470, 43 L.Edüd 712 (1975). However, the Court cautioned that “special facts and circumstances” may produce a “risk of unfairness” which is “intolerably high.” With-row, 421 U.S. at 58, 95 S.Ct. at 1470. However, one “must overcome a presumption of honesty and integrity of those serving as adjudicators; and ... must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.” Id. at 47, 95 S.Ct. at 1464.
Judge Russell relies on In re Murchison, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955) in arguing that because the same *946 attorneys who prosecute the case also advise the commission on whether a violation occurred violates due process. However, in Withrow, the Court explicitly stated that “Murchison has not been understood to stand for the broad rule that members of administrative agency may not investigate the facts, institute proceedings, and then make the necessary adjudications.” With-row, 421 U.S. at 53, 95 S.Ct. at 1467-68. Moreover, Murchison involved a state judge who sat as a one-man grand jury. The judge compelled witnesses to testify before him in secret about possible crimes. The judge cited two witnesses with criminal contempt and then proceeded to try and convict the same individuals of that offense. The Supreme Court held that such a procedure violated due process “not only because the judge in effect became part of the prosecution and assumed an adversary position, but also because as a judge ... he very likely relied on his own personal knowledge and impression of what had occurred in the grand jury room, an impression that could not be tested by cross-examination.” Withrow, 421 U.S. at 53, 95 S.Ct. at 1467.
In the ease at bar, the procedures of the Commission do not rise to the level of .that present in Murchison. Here, the Rule 5 of the Commission states that either upon receipt of information regarding the judge’s conduct or upon its own motion, the Commission will initiate a confidential inquiry into the allegations. After the preliminary inquiry, the Executive Director of the Commission shall make a report to the Commission. Rule 8 governs the formal hearing and requires the Commission to either employ a member of the State Bar to prepare and present the formal complaint to the Commission or direct the Executive Director to so represent the Commission as counsel.
Following a formal hearing, the Commission or designated panel is required to prepare findings of fact and recommendations. The full Commission shall review the findings and recommendations of a panel. Recommendations of the Commission are then made to this Court which may accept, reject, modify in whole or in part the findings and recommendations of the Commission.
Decisions from other states which have considered their own Judicial Commission are helpful. For example, the Supreme Court of Michigan stated, “[t]he authority is legion in support of the proposition that combining the investigative and adjudicative roles in a single agency does not necessarily violate due process in administrative adjudications such as judicial fitness hearings.” Matter of Del Rio, 400 Mich. 665, 256 N.W.2d 727, 736-37 (1977).[3]
Here, as in Withrow, there appears to be “no more evidence of bias or the risk of bias ... than inheres in the very fact that the Board had investigated and would now adjudicate.” 421 U.S. at 54, 95 S.Ct. at 1468. The processes of the Commission do not in and of themselves appear to present an unacceptable risk of bias. This Court, when presented with a challenge to the Mississippi State Oil & Gas Board, held that “at least on paper today, the Board seems to keep appropriately separate these functions....” McGowan v. Mississippi State Oil & Gas Bd., 604 So.2d 312,317 (Miss.1992). Like the Oil & Gas Board, the Judicial Performance Commission, under its Rules, “sits as an entity with authority independent of that of the agency’s supervisor and staff.” Id. The Commission argues in its brief that Commission counsel does not participate in the deliberation process. However, Judge Billy Joe Landrum, who served on the original panel which considered the charges against Judge Russell, testified that the Executive Director of the Commission may answer questions of Commission members after a hearing this, alone, is not necessarily violative of due process. There remains the fact that Judge Russell has not demonstrated that bias in fact permeates the process.
However, in Withrow, the Court was cognizant that “we should be alert to the possibilities of bias that may lurk in the way *947 particular procedures actually work in practice.” 421 U.S. at 54, 95 S.Ct. at 1468. Judge Russell argues that because the Executive Director of the Commission approves the expenses of Commission members, a possible financial motive exists for Commissioners to find in accordance with the Executive Director.
In Withrow, the Court held “[without a showing to the contrary, state administrators are assumed to be men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances.” 421 U.S. at 55, 95 S.Ct. at 1468 (quoting United States v. Morgan, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941)). Here, Judge Russell presents no specific foundation for suspecting that the Commission was in any way biased toward the Executive Director of the Commission or his investigation into Judge Russell.
The United States Supreme Court has held that the standard used to evaluate allegations of financial bias as violations of due process is “whether the ... situation is one which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused....” Ward v. Village of Monroeville, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972). Here, the allegation of financial bias is at best tenuous. Here, the record contains no evidence that decisions adverse or contrary to Mr. Brantley will result in financial retribution via expense accounts.
Here is simply not sufficient evidence of financial bias or motivation is present which would violate due process. Moreover, the conclusions of the Commission are merely recommendations to this Court and thus have no binding effect. Rather, this Court conducts de novo review of judicial misconduct proceedings and is the final arbiter of these matters.
VI. WHETHER SANCTIONS IMPOSED UPON JUDGES DESTROY THE INDEPENDENCE OF THE JUDICIARY.
Judge Russell argues that because he enjoys judicial immunity from tort liability and damage awards, he likewise should be immune from judicial misconduct proceedings because he will be inhibited from making “fearless judicial decisions” if he may be “fined, publicly reprimanded, or even removed from office.” Judge Russell argues that decisions as to whether to suspend the execution of sentences is a judicial act, and therefore judges should enjoy both immunity from damages and disciplinary proceedings.
Mississippi has long recognized the doctrine of judicial immunity. Bell v. McKinney, 63 Miss. 187 (1885); DeWitt v. Thompson, 192 Miss. 615, 7 So.2d 529 (1942). This Court recognizes that “[pjublic policy mandates that a judge should have the power to make decisions without having to worry about being held liable for his actions....” Loyacono v. Ellis, 571 So.2d 237, 238 (Miss. 1990). “[T]his Court fully recognizes that the best interests of the people and public order require that judges be immune from civil liability.” Id. “There are other remedies for the correction of such behavior.” Id.
The primary remedy available to those who believe a judge has acted either contrary to or in excess of his/her authority is to file a complaint with the Commission. If cause exists for such complaint the Commission will then investigate and proceed formally with ultimate resolution taking place before this Court.
The purpose of the Mississippi Judicial Performance Commission is set forth in Rule 1 B. of the Rules of the Mississippi Commission on Judicial Performance “The Commission shall enforce the standards of judicial conduct, inquire into judicial disability and conduct, protect the public from judicial misconduct and disabled judges, and protect the judiciary from unfounded allegations.”
The functions of judicial disciplinary proceedings are varied. However, this Court, in reference to attorney discipline, held, “the purpose of discipline is not to punish the ‘guilty’ attorney, but to protect the public, the administration of justice, to maintain appropriate professional standards, and to deter similar conduct.” Mississippi State Bar v. A Miss. Attorney, 489 So.2d 1081, 1084 *948 (Miss.1986)(citing In re Ruffalo, 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968)). In addition, this Court has held that “the role of the Mississippi State Bar with respect to the consideration of complaints against members of the Bar is to provide an official investigation thereof and a tribunal for the trial and disposition of such complaints-” Netterville v. Mississippi State Bar, 404 So.2d 1026, 1027 (Miss.1981).
To hold judges exempt from professional misconduct proceedings would deprive members of the public of any remedy. Moreover, to hold that judges may not be sanctioned for actions which exceed their lawful authority would totally disregard the protection of the public, the administration of justice, the maintenance of professional standards, and the deterrence of similar conduct. “We discipline a judge to reassure the citizens ... that the judiciary of their state is dedicated to the principle that ours is a government of laws and not of men.” In re Kneifl, 217 Neb. 472, 351 N.W.2d 693 (Neb.1984).
Judge Russell’s argument fails to take into account that judges are elected officials, accountable to the public who elects them. Moreover, there is the need, as well as the duty to insure that those entrusted with the privilege of holding such an esteemed position, maintain that privilege with integrity and remain within the confines of their authority.
VII. WHETHER SANCTIONS IMPOSED UPON JUDGE RUSSELL REGARDING THE KEMP MATTER ARE BARRED BY THE STATUTE OF LIMITATIONS.
Judge Russell argues that the charges in the Royce Kemp case are time-barred. A review of the Rules of the Commission on Judicial Performance reflects no controlling statute of limitations, Judge Russell argues that the three-year statute of limitations utilized in attorney discipline cases should apply. If not, Judge Russell requests that this Court adopt a period which will govern judicial performance cases.
The Rules of the Commission on Judicial Performance do not set forth a statute of limitations for judicial performance cases and thus, in no event are the charges against Judge Russell time-barred.
CONCLUSION
The facts in this case were uncontroverted and the relevant legal principles clear. As a result, Judge Russell either knew or should have known that his actions were in excess of the authority and jurisdiction conferred upon him as a circuit court judge. Because of the repeated nature and the magnitude of the conduct we agree that Judge Russell engaged in willful misconduct in office or conduct which is prejudicial to the administration of justice which brings the judicial office into disrepute. Based on the foregoing, we affirm the recommendations of the Judicial Performance Commission. We therefore find, and so order that Judge Russell should be publicly reprimanded; fined $1500.00; and taxed with all costs of these proceedings.
AFFIRMED.
PRATHER and SULLIVAN, P.JJ., and PITTMAN and BANKS, JJ., concur.
DAN LEE, C.J., concurs in result only.
McRAE, JAMES L. ROBERTS, Jr., and MILLS, JJ., not participating.

. § 47-7-47 Earned probation program; restitution to crime victim.
(1) The judge of any circuit court may place an offender on a program of earned probation after a period of confinement as set out herein and the judge may seek the advice of the Commissioner of the Department of Corrections and shall direct that such defendant be under the supervision of the Department of Corrections.
2(a) Any circuit court or county court may, upon its own motion, acting upon the advice and consent of the Commissioner of the Department of Corrections at the time of the original sentencing only, not earlier than thirty (30) days nor *938 later than one hundred eighty (180) days after the defendant has been delivered to the custody of the Department of Corrections, to which he has been sentenced, suspend the further execution of the sentence and place the defendant on earned probation except in a case where a death sentence or life imprisonment is the maximum penalty which may be imposed or where the defendant has been confined for the conviction of a felony on a previous occasion in any court or courts of the United States and of any state or territories thereof or has been convicted of a felony involving the use of a deadly weapon.
(b) The authority granted in this subsection shall be exercised by the judge who imposed sentence on the defendant, or his successor.
(c) The time limit imposed by paragraph (a) of this subsection shall not be applicable to those defendants sentenced to the custody of the Department of Corrections prior to April 14, 1977. Persons who are convicted of crimes that carry mandatory sentences shall not be eligible for earned probation.

. The dates described relate to the case of Robert Daniel Parham. Parham was sentenced to twenty years in the custody of MDOC, with ten years suspended for the crime of manslaughter in the death of his girlfriend.

. See also, In re O'Dea, 159 Vt. 590, 622 A.2d 507 (1993); In re Elliston, 789 S.W.2d 469 (Mo. 1990); Matter of Cunningham, 517 Pa. 417, 538 A.2d 473, app. dismissed, 488 U.S. 805, 109 S.Ct. 36, 102 L.Ed.2d 16 (1988); Matter of Deming, 108 Wash.2d 82, 736 P.2d 639, as amended by 744 P.2d 340 (1987).