725 So.2d 162 (1998)
MISSISSIPPI COMMISSION ON JUDICIAL PERFORMANCE
v.
Hyde Rust JENKINS, II.
No. 98-CC-00212-SCT.
Supreme Court of Mississippi.
September 10, 1998.
Rehearing Denied November 19, 1998.
*163 Luther T. Brantley, III, Jackson, for Appellant.
C. Victor Welsh, III, Jackson, for Appellee.
EN BANC.
JAMES L. ROBERTS, Jr., Justice, for the Court:

STATEMENT OF THE CASE
¶ 1. On June 2, 1997, Erik M. Lowrey, Commission Chairman, entered an Order appointing a Formal Commission to conduct a hearing concerning Hyde Rust Jenkins, II (hereinafter "Jenkins"), Chancery Court Judge for the Seventeenth Chancery Court District of Mississippi. On June 5, 1997, the Mississippi Commission on Judicial Performance (hereinafter "Commission") filed a formal complaint charging Jenkins with judicial misconduct constituting willful misconduct in office and conduct prejudicial to the administration of justice which brings the judicial office into disrepute as set forth in Section 177A, Mississippi Constitution of 1890, as *164 amended. It was further alleged that Jenkins had engaged in the practice of law in violation of Miss.Code Ann. § 9-1-25 (Supp. 1997), and § 23-15-975 (Supp.1997). The Complaint also charged Jenkins with violating Canons 1, 2 A, 2 B, 3 A(1), 3 A(4), 3 C, 5 C(1) and 5 F of the Code of Judicial Conduct of the Mississippi Judges. On October 8, 1997, after obtaining a continuance on the hearing of the instant matter, Jenkins filed an Answer to the Formal Complaint. The basis for the Formal Complaint was two counts of alleged misconduct.
¶ 2. A hearing was held before a duly appointed panel of Commission members in Jackson, Mississippi on October 15 and 16, 1997. At the conclusion of the hearing and subsequent to both parties filing proposed findings of fact and conclusions of law, the panel concluded that both counts of misconduct were determined to have been proved by clear and convincing evidence. The Committee further recommended that Jenkins be removed from office and assessed the costs accrued in this matter. Thereafter, the Commission by unanimous vote agreed with the findings of the Committee that Jenkins be removed from judicial office and taxed with all costs of this matter in the amount of $2,863.77.

I. DID THE CONDUCT OF JENKINS CONSTITUTE WILLFUL MISCONDUCT IN OFFICE AND CONDUCT PREJUDICIAL TO THE ADMINISTRATION OF JUSTICE WHICH BRINGS THE JUDICIAL OFFICE INTO DISREPUTE, PURSUANT TO SECTION 177A OF THE MISSISSIPPI CONSTITUTION OF 1890, AS AMENDED?

II. SHOULD JENKINS BE REMOVED FROM JUDICIAL OFFICE AND ASSESSED THE COSTS OF THIS PROCEEDING BY THE MISSISSIPPI SUPREME COURT, PURSUANT TO SECTION 177A OF THE MISSISSIPPI CONSTITUTION OF 1890, AS AMENDED?

STATEMENT OF THE FACTS
¶ 3. Jenkins has served as Chancery Court Judge of the Seventeenth Chancery District of the State of Mississippi, which includes Adams, Claiborne, Jefferson and Wilkinson Counties, since October of 1987. He has, since that time, been both privately admonished by the Commission and publicly reprimanded by this Court. See Mississippi Comm'n on Judicial Performance v. Jenkins, 677 So.2d 171 (Miss.1996).
¶ 4. Southern Landfill Management, Inc. (hereinafter "SLM") is a Mississippi Corporation owned at least in part by Jack Tomlinson and Robert Hume of Canada, that began negotiations early in the 1990's with Jefferson County, Mississippi for the construction and operation of a solid waste landfill in that county. Jenkins initially met Tomlinson during the time of the negotiations and assisted him in finding property along the Mississippi River that might be used for unloading garbage from barges onto trucks for transportation to the landfill. Apparently Jenkins was initially called because his father owns a dock and storage facility in Vidalia, Louisiana, just across the Mississippi River from Natchez, Mississippi, which possibly could have been adapted for that purpose.
¶ 5. On April 8, 1993, the Board of Supervisors of Jefferson County were in the process of securing bids for the operation of the Jefferson County Landfill. At this meeting, Jenkins addressed the Jefferson County Board of Supervisors on behalf of Tomlinson and SLM who were still involved in negotiations with the county to purchase the Jefferson County Landfill. The minutes of that board meeting reflect that Jenkins recommended to the Board that it accept SLM's offer. Also, during this same time period, Gerry Winters, a 50% stockholder in Southern Transporters, Incorporated, along with Jenkins, became interested in the garbage collection and hauling business, although those plans did not fully come to fruition until February of 1996.
¶ 6. In approximately September of 1992, Gill Smith, the attorney for Tomlinson and SLM, initiated negotiations with Marrion Green for the lease or purchase of certain property adjoining the Jefferson County Landfill. The property, a 113-acre tract, was known as the Lucille Fulton or Wesley Fulton land. Green and his sister owned an *165 interest in the property and the other interest was vested in the Estate of Lucille Fulton (Jones), Green's grandmother. On October 21, 1993, Green filed a petition to probate the will of Lucille Fulton which devised her interest in the tract to Katie Ruth Denelli, Green's sister. At the time the will was probated Jenkins was the only Chancery judge serving Jefferson County. During this time SLM, through Smith, was acquiring purchase options from the Fulton heirs to the interest in the tract in the instance the will was declared invalid. Green's sole purpose, according to him was to try to lease, not sell, all of the property and keep the entire 113 acre tract in his family. Negotiations between Green and Smith became strained and in mid-November, 1993 Odell Anders set up a meeting between Jenkins and Marrion Green. According to Jenkins, Anders called Jenkins out of the blue and told him that Green would like to speak with Jenkins "about the guys at the landfill." Green confirms that Anders set up his initial meeting with Jenkins. At this point the stories begin to differ, although many similar facts are confirmed by both parties.
¶ 7. According to Jenkins, Green and a friend showed up at his home on November 18, 1993, at 10:00 p.m. Although they had never met before, the judge invited them in and they began drinking gin and talking about hunting. Jenkins stated that he and Green began talking about the landfill and he told Green everything he knew about the landfill and the people who were involved. Green told Jenkins about SLM's proposed offer for the Wesley-Fulton tract and in turn Jenkins told Green that the offer was a good deal. Jenkins recalled that Green informed Jenkins that he needed to get the proposed lease agreement into one document. Green advised the judge on the details of the lease and Jenkins typed the proposed lease agreement into a cohesive document. According to Jenkins, he left some blank lines in the document and filled in the monetary terms of the lease in his own hand writing later in the evening after which Green took the document and left around 2:30 in the morning. By his own testimony, Jenkins not only typed and wrote the lease, but gave Green certain advice about the purchase of the property.
¶ 8. Green's recollection of the events of November 18th and 19th, 1993 differ from Jenkins' in two respects. According to Green he saw Jenkins not only at his home on the evening of November 18th and the morning of the 19th, he also conferred in chambers with Jenkins on the afternoon of November 18th and later on the morning of the 19th at the law office of Gill Smith. Green testified that on the afternoon of November 18, 1993, he and his brother, James, met with Jenkins in his chambers at the Adams County Courthouse wherein they discussed the proposed lease of the Wesley Fulton property and the probate of the will of Lucille Fulton. Green recalled presenting the will to Jenkins who make a copy thereof. This was confirmed by James W. Green, Marrion Green's brother. Marrion Green stated that he had to leave for work later that afternoon but he and Jenkins made arrangements for Green to come by Jenkins home later that night to complete the terms of the SLM lease of Green's property. According to Green, the terms of the lease were completed at Jenkins' home when he arrived there at 11:00 p.m. on the same night. It was Green's recollection that once the lease was completed, save the blanks that were not filled in, he left it with the judge who brought it to the law office of Gill Smith the next morning where they met again.
¶ 9. On the morning of November 19, 1993, Green, his brother, James, and friend Tony Byrd met with Jenkins, Odell Anders and Gill Smith at Smith's law office. It was at this meeting that the terms of the lease were finalized and Jenkins filled in the monetary amounts per acre in his own handwriting according to Green, his brother and Tony Byrd. This meeting was further substantiated by the testimony of Betty Butler, Green's sister, who spoke with her brothers, Smith and Jenkins on the telephone from her place of employment in Chicago, Illinois. Further confirmation of the meeting was had through the testimony of Gill Smith who recalled that Anders was present but could not say for certain if Jenkins was there.
¶ 10. Whether Jenkins was at the meeting in Smith's office on the morning of November *166 19, 1993, is of little consequence in light of the fact that he at least partially drafted the lease, some of which is admittedly in his own hand writing. Moreover, the record supports the supposition that Jenkins had ongoing contact with Green regarding the SLM lease throughout this period of time and during the ensuing will contest. This is especially evident from the testimony of Green and Gill Smith and letters and memoranda forwarded to Green and Jenkins regarding this matter. Smith confirmed that he had written a memoranda to Green stating in part:
I have made copies of everything I can think of which would shed some light on your families lease situation with Jack Tomlinson and his corporation, and delivered it to Judge Jenkins, together with a memorandum explaining what each of the documents are. He told me that he had gotten in touch with you and I gathered that since he has now received just about all the material that I have, or copies of it, he will be getting back in touch with you so that you all can sit down and hash this thing out.
This evidence against Jenkins confirms Green's version of the events in which he stated that he met with Jenkins on more than the one occasion. It also lends support to the fact that Jenkins was involved in every aspect of the lease negotiation, as he had copies of every document concerning the matter.
¶ 11. On December 14, 1993 various heirs of Lucille Fulton filed a petition to contest the will of Lucille Fulton (Jones) in the Chancery Court of Jefferson County, Mississippi, before Judge Jenkins. On May 24, 1994, the will contestants filed their Motion for Summary Judgment. SLM through Gill Smith filed a petition to intervene and Motion to Show Cause in the will contest alleging that SLM would suffer irreparable harm and injury if not allowed to intervene. This Motion was filed on May 31, 1994, requesting the judge extend the purchase options that SLM had acquired from the will contestants. On June 14, 1994, the options were extended by order of Judge Jenkins for a period of forty-five days subsequent to the final judgment on the will. On November 11, 1994, SLM filed a Motion to Show Cause requesting relief in its negotiations with Green which was granted by Jenkins. On July 14, 1995, Jenkins granted the contestants Motion for Summary Judgment.
¶ 12. The evidence reveals that Gerry Winters and Jenkins attended at least two public hearings regarding Mississippi Department of Environmental Quality issuing the necessary subtitle D permit for operation of the landfill by SLM. One of these meetings was the final DEQ meeting in Jackson, Mississippi wherein the actual permit was issued to SLM. Furthermore, the record is clear that the Southern Transporters Incorporated, the Jenkins and Winters garbage hauling business, has an ongoing and lucrative relationship with SLM, the same company Jenkins was initially involved with in the early 1990's and for whose benefit he ruled in the will contest of Green's probate proceedings.

DISCUSSION OF THE ISSUES

I. DID THE CONDUCT OF JENKINS CONSTITUTE WILLFUL MISCONDUCT IN OFFICE AND CONDUCT PREJUDICIAL TO THE ADMINISTRATION OF JUSTICE WHICH BRINGS THE JUDICIAL OFFICE INTO DISREPUTE, PURSUANT TO SECTION 177A OF THE MISSISSIPPI CONSTITUTION OF 1890, AS AMENDED?
¶ 13. The appropriate standard of review used in a judicial disciplinary proceeding is derived from Rule 10(E) of the Rules of the Mississippi Commission on Judicial Performance. Mississippi Comm'n on Judicial Performance v. Russell, 691 So.2d 929, 935 (Miss.1997). This Court conducts de novo review of judicial misconduct proceedings, giving great deference to the findings, based on clear and convincing evidence, of the recommendations of the Mississippi Judicial Performance Commission. Although this Court gives great deference to the recommendations of the Commission, it is in no way bound by them and may also impose additional sanctions. Mississippi Comm'n on Judicial Performance v. Whitten, 687 So.2d 744, 746 (Miss.1997).
*167 ¶ 14. There is evidence in the record that Jenkins established a relationship with Jack Tomlinson and others involved with SLM by assisting them in locating a barge landing site for the Jefferson County Landfill. Once the relationship with SLM was established, Jenkins began to use his unique position as judge for the benefit of SLM when in April of 1993, he appeared before the Jefferson County Board of Supervisors on behalf of Tomlinson for SLM. This action violated Canons 1, 2 A, 2 B, 3 A(1) and 5 C(1).
¶ 15. The relationship between SLM and Jenkins continued until Jenkins became deeply involved with the lease negotiations between SLM and Marrion Green. This included advising Green on the benefits of dealing with the landfill and drafting the lease agreement himself. This trust was intensified in Green's mind because not only was Jenkins a lawyer, he was also a judge. In fact, Jenkins was the very judge who would not only settle any controversy about the lease but also would make the decision as to the validity of the will probated by Green. The subject of the will was the same land which was the subject of the lease prepared by Jenkins. With this continuing course of conduct, Jenkins violated Canons 1, 2 A, 2 B, 3 A(1), 3 C, 5 C(1) and 5 F of the Code of Judicial Conduct of Mississippi Judges. Furthermore, Jenkins engaged in the practice of law in violation of Miss.Code Ann. § 9-1-25 (Supp.1997), and § 23-15-975 (Supp.1997). This Court defined the practice of law to include "... the drafting or selection of documents, the giving of advice in regard to them, and the using of an informed or trained discretion in the drafting of documents to meet the needs of the person being served. So any exercise of intelligent choice in advising another of his legal rights and duties brings the activity within the practice of the legal profession. Oregon State Bar v. Security Escrows, Inc., 233 Or. 80, 377 P.2d 334 (1962)." Darby v. Mississippi State Bd. of Bar Admissions, 185 So.2d 684, 687 (Miss. 1966). Section 9-1-25 reads in part:
It shall not be lawful for any judge of the Supreme Court, Court of Appeals or a judge of the circuit court, or a chancellor to exercise the profession or employment of an attorney or counsellor at law, or to be engaged in the practice of law; and any person offending against this prohibition shall be guilty of a high misdemeanor and be removed from office. ...
Miss.Code Ann. § 9-1-25 (Supp.1997) (emphasis added).
¶ 16. While continuing his negotiations with Green, on behalf of SLM, Jenkins allowed SLM to intervene in the will contest and subsequently ruled in SLM's favor. These actions of Jenkins were in contravention of Canons 1, 2 A, 2 B, 3 A(1), 3 A(4), 3 C, 3 D (by virtue of violating 3 C), 5 C(1) and 5 F. These Canons read as follows:
CANON 1
An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved.
CANON 2
A. A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
B. A judge should not allow his family, social, or other relationships to influence his judicial conduct or judgment. He should not lend the prestige of his office to advance the private interests of others; nor should he convey or permit others to convey the impression that they are in a special position to influence him. He should not testify voluntarily as a character witness.
CANON 3
The judicial duties of a judge take precedence over all his other activities. His judicial duties include all the duties of his office prescribed by law. In the performance of these duties, the following standards apply:
A. Adjudicative Responsibilities.

*168 (1) A judge should be faithful to the law and maintain professional competence in it. He should be unswayed by partisan interests, public clamor, or fear of criticism.
* * * * * *
(4) A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider ex parte or other communications concerning a pending or impending proceeding. A judge, however, may obtain the advice of a disinterested expert on the law applicable to a proceeding before him if he gives notice to the parties of the person consulted and the substance of the advice, and affords the parties reasonable opportunity to respond.
* * * * * *
C. Disqualification.
(1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:
(a) he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;
(b) he served as lawyer in the matter in controversy ...
(c) he knows that he, individually or as a fiduciary, ... has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;
* * * * * *
(2) A judge should inform himself about his personal and fiduciary financial interests....
* * * * * *
D. Remittal of Disqualification. A judge disqualified by the terms of Canon 3C(1)(c) ... may, instead of withdrawing from the proceeding, disclose on the record the basis of his disqualification. If based on such disclosure, the parties and lawyers, independently of the judge's participation, all agree in writing that the judge's relationship is immaterial or that his financial interest is insubstantial, the judge is no longer disqualified, and may participate in the proceeding. The agreement, signed by all parties and lawyers, shall be incorporated in the record of the proceeding.
CANON 5
A Judge Should Regulate His Extra-Judicial Activities to Minimize the Risk of Conflict With His Judicial Duties.
* * * * * *
C. Financial Activities.
(1) A judge should refrain from financial and business dealings that tend to reflect adversely on his impartiality, interfere with the proper performance of his judicial duties, exploit his judicial position, or involve him in frequent transactions with lawyers or persons likely to come before the court on which he serves.
* * * * * *
F. Practice of Law. A judge should not practice law, if by statute he is a full time judge.
¶ 17. Furthermore, the ex parte communications between Smith, SLM, Green and Jenkins were extensive. This is especially exhibited in the memoranda and letters from Smith to Green and Jenkins. "`For a judge to merely listen to another person involved in pending litigation is a violation of Canon 3A(4).'" Mississippi Comm'n on Judicial Performance v. Russell, 691 So.2d 929, 941 (Miss.1997) (quoting Mississippi Comm'n on Judicial Performance v. Chinn, 611 So.2d 849, 852 (Miss.1992)).
¶ 18. Additionally, while still acting as Chancellor in the will contest, Jenkins formed a corporation, Southern Transporters, Inc., and entered into a business relationship with SLM, again violating each of the Canons listed above.
¶ 19. It is fundamental that judges should be sufficiently detached and unencumbered from any proclivity towards predisposition of any matter that may come before them. This is the pervading theme throughout *169 the Code of Judicial Conduct and the theme of impartiality is an integral factor which permeates statutory and common law. Jenkins argued at the hearing below and in his brief that even with his glaring conflicts of interests and improprieties, he was allowed to proceed because no one objected. This Court employs an objective standard to determine if, under Canon 3, a judge should have recused himself. The test for recusal is as follows: "A judge is required to disqualify himself if a reasonable person, knowing all the circumstances, would harbor doubts about his impartiality." Dowbak v. State, 666 So.2d 1377, 1389 (Miss.1996) (quoting Green v. State, 631 So.2d 167, 177 (Miss.1994)). "The decision to recuse or not to recuse is one left to the sound discretion of the trial judge, so long as he applies the correct legal standards and is consistent in the application." Collins v. Joshi, 611 So.2d 898, 902 (Miss.1992). In the case at hand, Jenkins did abuse his discretion in failing to recuse himself from the case. Jenkins' impartiality is evident from the record. Other jurisdictions have censured or removed judges from office for the practice of law alone and in none of those cases was the judge's conduct so egregious as the conduct of Jenkins. See In re Moynihan, 80 N.Y.2d 322, 590 N.Y.S.2d 74, 604 N.E.2d 136 (1992); In re Grenz, 534 N.W.2d 816 (N.D.1995); In re Fleischman, 188 Ariz. 106, 933 P.2d 563 (1997).
¶ 20. Jenkins engaged in a variety of irregularities and improprieties both on and off the bench. He engaged in a course of conduct whereby he violated many of the Canons of the Code of Judicial Conduct of Mississippi Judges. This conduct constitutes willful misconduct in office and conduct prejudicial to the administration of justice which brings the judicial office into disrepute pursuant to Section 177A of the Mississippi Constitution of 1890, as amended, and as defined by this Court. Article 6, Section 177A reads in part, "On recommendation of the commission on judicial performance, the supreme court may remove from office, suspend, fine or publicly censure or reprimand any justice or judge of this state for: ... (b) willful misconduct in office; ... or (e) conduct prejudicial to the administration of justice which brings the judicial office into disrepute." As the Court stated in Mississippi Commission on Judicial Performance v. Vess, 692 So.2d 80 (Miss.1997):
Wilful misconduct in office is the improper or wrongful use of power of his office by a judge acting intentionally or with gross unconcern for his conduct and generally in bad faith. It involves more than an error of judgment or a mere lack of diligence. Necessarily, the term would encompass conduct involving moral turpitude, dishonesty, or corruption, and also any knowing misuse of the office, whatever the motive. However, these elements are not necessary to a finding of bad faith. A specific intent to use the powers of the judicial office to accomplish a purpose which the judge knew or should have known was beyond the legitimate exercise of his authority constitutes bad faith.... Wilful misconduct in office of necessity is conduct prejudicial to the administration of justice that brings the judicial office into disrepute. However, a judge may also, through negligence or ignorance not amounting to bad faith, behave in a manner prejudicial to the administration of justice so as to bring the judicial office into disrepute.
Mississippi Comm'n on Judicial Performance v. Vess, 692 So.2d 80, 83-84 (Miss. 1997).
¶ 21. Jenkins' conduct is also conduct prejudicial to the administration of justice which brings the judicial office into disrepute. As the Court stated in In re Anderson, 451 So.2d 232 (Miss.1984):
While the conduct of respondent, in our opinion, amounted to willful misconduct in office prejudicial to the administration of justice, bringing the judicial office into disrepute, we recognize as quoted in In re Anderson, supra, that a judge may also, through negligence or ignorance, not amounting to bad faith, behave in a manner prejudicial to the administration of justice so as to bring the judicial office into disrepute. The result is the same regardless of whether bad faith or negligence and ignorance are involved and warrants sanctions.
*170 In re Anderson, 451 So.2d 232, 234 (Miss. 1984). This Court has found that misconduct does not have to be imbedded in any form of bad behavior. "Negligence, ignorance and incompetence are sufficient for a judge to behave in a manner prejudicial to the administration of justice which brings the judicial office into disrepute." Mississippi Comm'n on Judicial Performance v. Franklin, 704 So.2d 89, 92 (Miss.1997).
¶ 22. When the total course of conduct by Jenkins is considered, it is clear the Commission findings are correct, and that his conduct constitutes willful misconduct in office and conduct prejudicial to the administration of justice which brings the judicial office into disrepute.

II. SHOULD JENKINS BE REMOVED FROM JUDICIAL OFFICE AND ASSESSED THE COSTS OF THIS PROCEEDING BY THE MISSISSIPPI SUPREME COURT, PURSUANT TO SECTION 177A OF THE MISSISSIPPI CONSTITUTION OF 1890, AS AMENDED?
¶ 23. This Court has recognized that the sanction should fit the offense. Mississippi Comm'n on Judicial Performance v. Russell, 691 So.2d 929, 942 (Miss.1997). Sanctions available to this Court include removal from office, suspension, fine and public reprimand, or private reprimand. Russell, 691 So.2d at 942 (citing Art. 6 § 177A, Miss. Const. (1890)). The sanction imposed should be consistent with other like cases and "ought [to] fit the offense." In re Bailey, 541 So.2d 1036, 1039 (Miss.1989). According to Section 177A and Rule 10 of the Rules of the Commission, the Commission recommends disciplinary sanctions and the Court, based upon a review of the entire record, determines the appropriate sanction. Mississippi Comm'n on Judicial Performance v. Franklin, 704 So.2d 89, 93 (Miss.1997). As the Court stated in In re Quick, 553 So.2d 522, 527 (Miss.1989):
In judicial misconduct proceedings, this Court is the trier of fact, and it has sole power to impose sanctions. Garner, 466 So.2d at 885; Collins, 524 So.2d at 556. Although this Court has an obligation to conduct an independent inquiry, it nonetheless gives great weight to the finding of the Commission, which has had the opportunity to observe the demeanor of the witnesses. Garner, supra, at 885; Collins, supra, at 556.
See also Mississippi Judicial Performance Comm'n v. Walker, 565 So.2d 1117 (Miss. 1990).
¶ 24. Judge Jenkins has been the subject of judicial discipline on two previous occasions: one resulting in a private reprimand and the other in a public reprimand by this Court. Mississippi Comm'n on Judicial Performance v. Jenkins, 677 So.2d 171 (Miss.1996). When considering the proper sanction to impose upon a judge the Commission may consider prior judicial misconduct on the part of that judge. See Franklin, 704 So.2d at 93-94 (1997).
¶ 25. Jenkins did not commit just a single isolated act of misconduct, but rather made a conscious decision to become involved in the practice of law and become financially and legally involved in a matter pending before him and continued to be so involved at least until the time of the hearing of the Commission. Jenkins knew or should have known that his involvement would bring his judicial office into disrepute. This involvement resulted in specific violations of the Constitution, and Canons of the Code of Judicial Conduct as well as statutory law which requires removal from office. As long as he remains in office, that office will remain in disrepute. Because of the gravity of his misconduct and extreme likelihood that even if other sanctions were imposed his office would remain in disrepute, removal from office is the only appropriate sanction. Furthermore, Jenkins should be assessed with all costs of this proceeding in the amount of $2,863.77.

CONCLUSION
¶ 26. After careful consideration of the findings of fact and recommendations of the Commission on Judicial Performance, as well as a thorough examination of the record, this Court finds, by clear and convincing evidence, that Jenkins has violated Canons 1, 2 A, 2 B, 3 A(1), 3 A(4), 3 C, 3 D, 5 C(1) and *171 5(F) of the Code of Judicial Conduct, Statutes § 9-1-25 and § 23-15-975, and Section 177A of the Mississippi Constitution.
¶ 27. Jenkins is clearly guilty of willful misconduct in the performance of his judicial duties, and his misconduct brought his judicial office into disrepute. His serious departure from proper standards of conduct justifies the punishment and penalty imposed upon him.
¶ 28. This Court accepts the Commission's recommendation of Jenkins' removal from office as the only way to reestablish the reputation and integrity of the office he holds, and this Court also affirms the Commission's recommendation that Jenkins be assessed with all costs of this proceeding totaling $2,863.77, which shall be paid within thirty (30) days of the finality of this opinion.
¶ 29. This opinion constitutes formal and official notice of the removal of Hyde Rust Jenkins, II, from the office of Chancery Court Judge of the Seventeenth Chancery District of the State of Mississippi. Pending the finality of this opinion by and through its official mandate, Hyde Rust Jenkins, II, is suspended, with pay, from any and all of the powers, duties and emoluments of the office of Chancellor effective immediately, and he is prohibited from performing any function(s) whatsoever associated with that office.
¶ 30. The Clerk of this Court is directed to mail certified copies of this opinion to:
 Hyde Rust Jenkins, II
 P.O. Box 1144
 Natchez, MS 39121
 Chancellor Kennie E. Middleton
 P.O. Box 1144
 Natchez, MS 39121
 Dr. Eric Clark
 Mississippi Secretary of State
and all chancery clerks and boards of supervisors of the Seventeenth Chancery District, being the counties of Adams, Claiborne, Jefferson and Wilkinson.
¶ 31. Hyde Rust Jenkins, II, shall immediately remove himself from the physical premises of the court pending the finality of this opinion.
¶ 32. HYDE RUST JENKINS, II, CHANCERY COURT JUDGE OF THE SEVENTEENTH CHANCERY DISTRICT, IS HEREBY REMOVED FROM OFFICE AS OF THE DATE OF THIS OPINION AND ASSESSED WITH TOTAL COSTS OF $2,863.77 TO BE PAID WITHIN THIRTY (30) DAYS.
PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., BANKS, SMITH, MILLS AND WALLER, JJ., CONCUR.
McRAE, J., NOT PARTICIPATING.