749 So.2d 1062 (1999)
MISSISSIPPI COMMISSION ON JUDICIAL PERFORMANCE
v.
Lillie Blackmon SANDERS.
No. 1999-JP-00282-SCT.
Supreme Court of Mississippi.
December 2, 1999.
*1063 Luther T. Brantley, III, Irene Mikell Buckley, Jackson, Attorneys for Appellant.
Reuben V. Anderson, James W. Craig, Debra M. Brown, Jackson, Attorneys for Appellee.
EN BANC.
PITTMAN, Presiding Justice, for the Court:

STATEMENT OF THE CASE
¶ 1. On April 2, 1998, the Mississippi Commission on Judicial Performance ("Commission") filed a formal complaint charging Lillie Blackmon Sanders (hereinafter "Judge Sanders"), Circuit Court Judge for the Sixth Circuit Court District of Mississippi, with judicial misconduct. On June 8, 1998, Judge Sanders filed a motion to dismiss, affirmative defenses, and an answer to the formal complaint.
¶ 2. A hearing on the matter was held on October 15-16, 1998, before a duly appointed committee of the Commission. The committee which presided over the hearing submitted the Committee Findings of Fact and Recommendation on December 1, 1998. On December 7, 1998, Judge Sanders requested additional time to submit objections to the committee findings. The motion was granted by order of the Commission on December 11, 1998, and Judge Sanders filed her objections on December 28, 1998.
¶ 3. On January 29, 1999, the Commission entered the Commission Findings of Fact and Recommendation recommending that Judge Sanders be publicly reprimanded, fined $3,000, and taxed with all costs ($2,156.80) associated with the prosecution of the matter. One Commission member dissented, voting for removal from office with costs.
¶ 4. The Commission filed its Commission Findings of Fact and Recommendation with this Court on February 10, 1999.

STATEMENT OF FACTS
¶ 5. On April 2, 1998, the Mississippi Commission on Judicial Performance filed a formal complaint charging Lillie Blackmon Sanders, Circuit Court Judge for the Sixth Circuit Court District of Mississippi, with judicial misconduct including violation of Canons 1, 2 A, 2 B, 3 A(1), 3 A(2), 3 A(3), 3 A(4), and 3 B(1) of the Code of Judicial Conduct of Mississippi Judges. Judge Sanders was also charged with judicial misconduct constituting willful misconduct in office and conduct prejudicial to the administration of justice which brings the judicial office into disrepute as set forth in Article 6, Section 177A, of the Mississippi Constitution of 1890, as amended.
¶ 6. The allegations of judicial misconduct stemmed from a complaint filed by Fred Ferguson. In Count I, the Committee charged that Judge Sanders, without allowing Ferguson the benefit of or opportunity to obtain counsel, questioned him about his failure to post an order of the court, found him in contempt, and jailed him under a cash appeal bond of $500,000. In Count II, Judge Sanders was charged with illegally expunging the records of Ronald Scott Havard and Gay Nell Havard. The Havards had pled guilty to the charge of Manufacture of a Schedule 1 Controlled Substance, More than Ounce but less than Kilogram Marijuana. In Count III, Judge Sanders was charged with ex parte communications involving defendant Gregory Thomas Brengettsy, his mother, and his attorney, George West, regarding the case to be tried before Judge Sanders. The District Attorney was not made a party to this proceeding. Shortly after the meeting, the District Attorney was notified that the defendant had waived his right to a jury trial. The defendant *1064 was subsequently tried before Judge Sanders without a jury and found not guilty. Count IV charged that Judge Sanders violated Article 6, Section 177A of the Mississippi Constitution of 1890, as amended, as her conduct constitutes willful misconduct in office and conduct prejudicial to the administration of justice which brings the judicial office into disrepute.
¶ 7. On June 8, 1998, Judge Sanders filed a motion to dismiss, affirmative defenses, and an answer to the formal complaint. In her motion to dismiss, Judge Sanders maintained that the prosecution of the complaint against her was for the sole reason that she is an African-American female. Judge Sanders stated that the actions of the Commission were racially discriminatory and violative of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.
¶ 8. Judge Sanders filed a motion to compel on September 30, 1998. In her motion, Judge Sanders alleged that the Commission failed to provide requested information relating to the race of judges. The Commission, in its answer, objected, stating that it did not keep such records as race and sex of judges who were disciplined.
¶ 9. This matter was heard on October 15-16, 1998, before a committee composed of Circuit Judge Clarence E. Morgan, III, presiding, Chancery Judge William H. Myers, and Justice Court Judge C.E. Robertson. A hearing on the merits was held with each side presenting testimony and documentary evidence.
¶ 10. The committee submitted the unanimous Committee Findings of Fact and Recommendation on December 1, 1998. The committee found that Judge Sanders abused her contempt powers and violated the Canons of Judicial Conduct in count I. The committee further found that Judge Sanders, in count II, violated Miss.Code Ann. § 41-29-150, and violated the Canons of Judicial Conduct. Count III was dismissed for lack of evidence. Count IV alleged, and the committee found, that Judge Sanders' cumulative conduct constituted willful, official misconduct and conduct prejudicial to the administration of justice which brings the judicial office into disrepute. The committee recommended that Judge Sanders be publicly reprimanded, fined $3,000, and be taxed with all costs associated with the prosecution of the matter.
¶ 11. On December 7, 1998, Judge Sanders requested additional time to submit objections to the committee findings. The motion was granted by order of the Commission on December 11, 1998, and Judge Sanders filed her objections on December 28, 1998.
¶ 12. On January 29, 1999, the Commission entered the Commission Findings of Fact and Recommendation recommending that Judge Sanders be publicly reprimanded, fined $3,000, and taxed with all costs ($2,156.80) associated with the prosecution of the matter. One Commission member dissented, voting for removal from office with costs.
¶ 13. The Commission filed its Commission Findings of Fact and Recommendation with this Court on February 10, 1999.
STATEMENT OF ISSUES
I. WHETHER THE RESPONDENT'S MOTION TO DISMISS WAS FRIVOLOUS, TOTALLY DEVOID OF MERIT, AND PROPERLY OVERRULED BY THE COMMISSION.
II. WHETHER THE RESPONDENT'S CONDUCT CONSTITUTES WILLFUL MISCONDUCT IN OFFICE AND CONDUCT PREJUDICIAL TO THE ADMINISTRATION OF JUSTICE WHICH BRINGS THE JUDICIAL OFFICE INTO DISREPUTE PURSUANT TO SECTION 177A OF THE MISSISSIPPI CONSTITUTION *1065 OF 1890, AS AMENDED.
III. WHETHER THE COMMISSION'S RECOMMENDATION THAT RESPONDENT BE FINED AND PUBLICLY REPRIMANDED IS SUPPORTED BY THE COMMISSION'S FINDINGS.

STANDARD OF REVIEW
¶ 14. Rule 10 E of the Rules of the Mississippi Commission on Judicial Performance sets forth the pertinent standard of review:
Based upon a review of the entire record, the Supreme Court shall prepare and publish a written opinion and judgment directing such disciplinary action, if any, as it finds just and proper. The Supreme Court may accept, reject, or modify, in whole or in part, the findings and recommendation of the Commission. In the event that more than one (1) recommendation for discipline of the judge is filed, the Supreme Court may render a single decision or impose a single sanction with respect to all recommendations.
Mississippi Comm'n on Judicial Performance v. Sanders, 708 So.2d 866, 871-72 (Miss.1998) (citations omitted). As this Court has further noted:
This Court conducts de novo review of judicial misconduct proceedings, giving great deference to the findings, based on clear and convincing evidence, of the recommendations of the Mississippi Judicial Performance Commission.... Although this Court considers the recommendations of the Commission, we are in no way bound by them and may also impose additional sanctions ...
Mississippi Comm'n on Judicial Performance v. Russell, 691 So.2d 929, 935 (Miss. 1997) (citations omitted).

ANALYSIS

I. WHETHER THE RESPONDENT'S MOTION TO DISMISS WAS FRIVOLOUS, TOTALLY DEVOID OF MERIT, AND PROPERLY OVERRULED BY THE COMMISSION.
¶ 15. Judge Sanders filed a motion to dismiss the formal complaint against her, alleging that the prosecution of the instant complaint, as well as one in which she was previously fined $1,500 and publicly reprimanded, Mississippi Comm'n on Judicial Performance v. Sanders, 708 So.2d 866 (Miss.1998), was a result of racially discriminatory selective prosecution. Judge Sanders then filed an unsuccessful motion to compel stating that the Commission had not replied in full to Respondent's First Set of Interrogatories and Production of Documents.
¶ 16. The United States Supreme Court has stated that a selective prosecution claim is an independent assertion of misconduct by a prosecutor, "... not a defense on the merits to the ... charge itself, ..." United States v. Armstrong, 517 U.S. 456, 463, 116 S.Ct. 1480, 1486, 134 L.Ed.2d 687 (1996). Judge Sanders is attempting to use the selective prosecution claim as a defense to the charges raised against her in the formal complaint. The charges in the formal complaint relate to alleged judicial misconduct by Judge Sanders and are a separate matter from the charges of selective prosecution against the Commission.
¶ 17. Judge Sanders asserts here that the prosecution should have been dismissed because of the statistical data that she was able to garner showing a racial disparity in the number of prosecutions. Secondarily, she asserts that if what she has presented does not warrant dismissal, the matter should, nevertheless, be remanded to the Commission for further discovery on the issue.
¶ 18. The Commission responded to Judge Sanders' discovery request and interrogatories *1066 by asserting that it did not maintain records by race, that compilation of information regarding the time spent on each of 3,500 complaints would be overburdensome, and that answers to certain portions of the interrogatories would violate the confidentiality obligations of the Commission.
¶ 19. In partial answers, the Commission revealed that for the period covered by the request, it had filed 158 formal complaints, filed more than one complaint against 22 judges, dismissed 14 complaints, retired one to the files, supplied copies of its annual reports which include summary data of complaints by type and category of judge, as well as a summary of recommendations filed with this Court. Except for the question of race and the information sought as to the total number of complaints filed with the Commission, the Commission seems to have fully rendered the information sought.
¶ 20. Judge Sanders filed a motion to compel further discovery. She suggested that the Commission should either grant the motion or take judicial notice of the supplementary documentation from other sources which contained evidence regarding the race of judges during relevant periods. That motion to compel was denied by the Commission committee with the finding that the Commission had given a full and complete answer based upon the information readily available to it. The supplemental evidence is in the record, however, and it is that data which forms the basis of Judge Sanders' request for dismissal.
¶ 21. What the data shows is a racial disparity. It does not show that any judge in circumstances similar to those here has not been similarly treated. Nor does it show a pattern of dissimilar treatment based upon race. We do note that where a statistical case is made such as the one before the Court, the Commission should assure not only itself, but also the public, by fully investigating the facts.
¶ 22. That said, we decline to dismiss the case based upon the statistical disparity shown. We accept the documents filed as sufficiently indicative of the evidence that Judge Sanders sought to bring to bear on this issue. We hold that the statistical data shown is insufficient to make a case of selective prosecution. United States v. Cooks, 52 F.3d 101, 105 (5th Cir.1995).

II. WHETHER THE RESPONDENT'S CONDUCT CONSTITUTES WILLFUL MISCONDUCT IN OFFICE AND CONDUCT PREJUDICIAL TO THE ADMINISTRATION OF JUSTICE WHICH BRINGS THE JUDICIAL OFFICE INTO DISREPUTE PURSUANT TO SECTION 177A OF THE MISSISSIPPI CONSTITUTION OF 1890, AS AMENDED.
¶ 23. Article 6, Section 177A of the Mississippi Constitution of 1890 allows this Court, with the recommendation of the Commission, to sanction judges for "willful misconduct in office or conduct which is prejudicial to the administration of justice which brings the judicial office into disrepute." "Willful misconduct" has been defined by this Court as:
Willful misconduct in office is the improper or wrongful use of the power of his office by a judge acting intentionally, or with gross unconcern for his conduct, and generally in bad faith. It involves more than an error of judgment or a mere lack of diligence. Necessarily, the term would encompass conduct involving moral turpitude, dishonesty, or corruption and also any knowing misuse of the office, whatever the motive. However, these elements are not necessary to a finding of bad faith. A specific intent to use the powers of the judicial office to accomplish a purpose which the judge knew or should have known was beyond the legitimate exercise of his authority constitutes bad faith.
Willful misconduct in office of necessity is conduct prejudicial to the administration *1067 of justice that brings the judicial office into disrepute. However, a judge may also, through negligence or ignorance not amounting to bad faith, behave in a manner prejudicial to the administration of justice so as to bring the judicial office into disrepute.
Mississippi Comm'n on Judicial Performance v. Sanders, 708 So.2d at 872 (citations omitted).
¶ 24. The Commission found that Judge Sanders abused her contempt powers as a Circuit Court Judge in ordering the arrest and imprisonment of Fred Ferguson, the Circuit Clerk of Adams County. The Commission further found that Judge Sanders unlawfully expunged the felony convictions of two criminal defendants.

Fred Ferguson
¶ 25. In Count I, it is alleged that Judge Sanders violated the constitutional and procedural due process rights of Fred Ferguson, Circuit Clerk of Adams County, when she had Ferguson arrested, interrogated, and jailed on a $500,000 cash appeal bond on contempt charges. This incident stemmed from Ferguson's removal of an order posted by Judge Sanders entering the terms of court for the Sixth Circuit Court District.
¶ 26. On the order in question, Judge Sanders identified herself as the Senior Circuit Court Judge. Ferguson, after reviewing an Attorney General's opinion that identified Circuit Court Judge Forrest Johnson as Senior Circuit Court Judge and talking with Senior Circuit Court Judge Johnson, posted Judge Johnson's order setting the terms of court. Discrepancies existed between Judge Sanders' order and Judge Johnson's order.
¶ 27. When Judge Sanders learned that her order had been taken down and Judge Johnson's order posted in its place, she telephoned Ferguson inquiring as to the reason for his action. Ferguson explained that there were discrepancies between Judge Johnson's order and Judge Sanders' order. He also explained that he had reviewed the Attorney General opinion that placed Judge Johnson as the senior circuit judge and talked with Judge Johnson before removing Judge Sanders' order. Judge Sanders became irate, insinuating that she would jail Ferguson if he did not post her order. As the conversation became more heated, Ferguson told Judge Sanders that the conversation was over and hung up the phone.
¶ 28. Shortly thereafter, Judge Sanders issued a warrant for Ferguson's arrest on a civil contempt charge. Ferguson was arrested and brought before Judge Sanders for a hearing. At no time was Ferguson advised of his right to counsel or allowed to obtain counsel. Judge Sanders proceeded to interrogate Ferguson who, under oath, explained again why he had taken down Judge Sanders' order. Ferguson then refused to answer any more questions and, arguably, turned away from the judge. Judge Sanders had Ferguson taken to jail and ordered that he be released only on posting a $500,000 cash appeal bond.
¶ 29. At the hearing before the Commission, Judge Sanders stated that Ferguson was charged with civil contempt because he refused to post her order and that he was actually arrested because of his direct contempt in hanging up the phone on her. Judge Sanders then testified that she held Ferguson in direct criminal contempt of court when he turned his back to the court and that the final conviction of Ferguson was for direct criminal contempt.
¶ 30. Initially Judge Sanders arrested Ferguson for direct contempt in hanging up the telephone during their heated conversation. However, according to Judge Sanders, the final contempt conviction was for Ferguson's act of turning his back to the court during the hearing being held regarding the constructive contempt. Ferguson's act of turning his back to the court was characterized by Judge Sanders as direct criminal contempt. After finding Ferguson guilty of direct criminal contempt, *1068 Judge Sanders placed Ferguson in jail and required a $500,000 cash appeal bond. She informed Ferguson that he would be released upon either his posting bond or upon his posting her order setting the terms of court.
¶ 31. This Court stated that "[c]riminal contempt penalties are designed to punish for past offenses and they do not end when the contemnor has complied with the court order." Purvis v. Purvis, 657 So.2d 794, 797 (Miss.1994)(citing Common Cause v. Smith, 548 So.2d 412, 415-16 (Miss.1989)). If one is guilty of civil contempt, "the contemnor must be relieved of the penalty when he performs the required act." Purvis, 657 So.2d at 796-97 (citing Hinds County Bd. of Supervisors v. Common Cause, 551 So.2d 107, 120 (Miss.1989)). Notwithstanding her own testimony, Judge Sanders treated Ferguson's actions in court as direct criminal contempt but imposed punishment for civil contempt: release upon the posting of her order with no fine imposed.
¶ 32. This Court is troubled that Judge Sanders is unclear as to the appropriate sanctions for each category of contempt. This Court has repeatedly stated that ignorance of the law is no defense for justice court judges. Mississippi Comm'n on Judicial Performance v. Chinn, 611 So.2d 849, 853 (Miss.1992) (citing In Re Bailey, 541 So.2d 1036, 1039 (Miss.1989)). This statement is equally applicable to circuit court judges. Whether Judge Sanders' failure to apply Purvis was intentional or not, the results were the same.
¶ 33. It could be argued that, whenever a judge is acting in his or her judicial capacity and has firsthand knowledge of a contemptuous act, such act is "in the presence of the court." It is clear Judge Sanders had firsthand knowledge of the telephone conversation. It is also clear Judge Sanders was in her judicial capacity, i.e. she called Ferguson in regard to an order she issued. Thus, in this view, there was an act of direct contempt here.
¶ 34. Regardless, however, Judge Sanders mishandled the situation. She did not impose a sanction for the direct contempt arising out of the telephone or the back turning incidents. She eventually ordered coercive detention for the constructive contempt of failing to post her order. Ferguson was arrested and brought to court to answer a contempt charge. Ferguson was never Mirandized nor was he allowed to obtain a lawyer. When Ferguson refused to answer any questions asked by the judge, he was held in contempt of court. However, it was Ferguson's right to refuse to answer questions in the absence of his attorney. Ferguson was then placed in jail on a $500,000 cash appeal bond in direct contravention to the statutes governing appeal bonds for criminal and civil contempt that allow a maximum bond of $2,000. Miss Code Ann. §§ 11-51-11, -12 (Supp.1999).
¶ 35. Still, Ferguson, who had hung up on the judge and turned his back to her in open court, had the key to relief from detention. He could have done as he was later advised to do by Judge Johnson, and what he should have done from the beginning. He ultimately did post the order as directed.
¶ 36. It cannot be denied however, that Judge Sanders acted inappropriately in proceeding with a constructive contempt hearing without affording Ferguson adequate notice and that the imposition of $500,000 bail was greatly excessive. There are a number of cases in our history where we have found an error in the use of the contempt power. Terry v. State, 718 So.2d 1097 (Miss.1998); Setser v. Piazza, 644 So.2d 1211 (Miss.1994); Mississippi Comm'n on Judicial Performance v. Chinn, 611 So.2d 849 (Miss.1993); Mabry v. Howington, 569 So.2d 1165 (Miss.1990); Cook v. State, 483 So.2d 371 (Miss.1986). We have not always, however, imposed sanctions for such error. Terry v. State, 718 So.2d 1097 (Miss.1998); Setser v. Piazza, 644 So.2d 1211 (Miss.1994); Mabry v. Howington, 569 So.2d 1165 (Miss.1990); *1069 Cook v. State, 483 So.2d 371 (Miss.1986). On the other hand, we have held that misuse of the contempt power is prejudicial to the administration of justice and that ignorance of the law of contempt is no excuse for a judicial officer. Mississippi Comm'n on Judicial Performance v. Chinn, 611 So.2d 849 (Miss.1993); Mississippi Judicial Performance Comm'n v. Walker, 565 So.2d 1117 (Miss.1990).
¶ 37. Despite the provocation, we conclude that Judge Sanders' misuse of the contempt power of the court was misconduct for which a sanction should ensue.

Ronald Scott Havard and Gay Nell Havard
¶ 38. In 1988, Ronald Scott Havard and Gay Nell Havard pled guilty to the manufacture of a controlled substance. In June 1995, Senior Circuit Court Judge Forrest Johnson denied the Havards' petitions for expungement of those convictions, finding there was no provision of law to grant such relief. He did, however, grant certificates of rehabilitation to the Havards. Judge Sanders signed orders that illegally expunged the records of the Havards.
¶ 39. Attorney Cynthia Davis, attorney for the Havards, testified that she initially petitioned Judge Johnson for the expungement of the Havards' records. Judge Johnson denied the expungement, telling Davis there was no authority for him to grant the requested relief. Judge Johnson did, however, grant the Havards certificates of rehabilitation.
¶ 40. After Judge Johnson's denial of the expungements, Davis petitioned Judge Johnson for reconsideration on the matter. Without waiting for Judge Johnson to rule on the motion for reconsideration, Davis mailed the petitions for expungement and the proposed orders to Judge Sanders on August 15, 1995. Davis testified that she did not disclose to Judge Sanders that Judge Johnson had already denied the expungements, nor did she disclose that she had filed motions to reconsider with Judge Johnson and that those motions were pending. At no time did Davis discuss these petitions with Judge Sanders.
¶ 41. Orders were eventually issued granting the expungement. The order granting Ronald Havard's expungement was dated September 1, 1995, with the word "September" handwritten over the typed word "July." The order that granted the expungement of Gay Havard's record was dated July 25, 1995, almost a month before Davis testified she mailed the petitions to Judge Sanders.
¶ 42. The orders appeared to have been signed by Judge Sanders, and she admitted that the signatures appeared to be her signature. Judge Sanders never denied signing the orders, but she did testify at the hearing that she did not remember signing the orders.
¶ 43. Judge Sanders testified that she was in Nevada when the order granting the expungement of Gay Havard's record was signed and that there was no way she could have signed those orders. However, her former court administrator testified that when the judge was in Nevada, she sent orders and other correspondence to the judge to sign. The former court administrator went on to say that she could not remember if the orders in question had been sent to the judge in Nevada to sign.
¶ 44. Judge Sanders then testified that if she signed those orders, it was done through trickery and false pretenses on the part of the Attorney Davis. Judge Sanders testified that she knew she could not expunge the record of one convicted of a manufacture conviction. Section 41-29-150 does not allow for the expungement of one who has been convicted of the manufacture of a controlled substance. Miss. Code Ann. §§ 41-29-139(c),(d) & -150 (1993 & Supp.1999).
¶ 45. The fact remains that the orders were signed, and the Havards' records were expunged. Judge Sanders had no legal authority to expunge the records of the Havards. Further, a look at the court files in the cases would have put Judge *1070 Sanders on notice that Judge Johnson had previously denied expungement to these defendants.
¶ 46. At the very least, Judge Sanders is guilty of illegally expunging records out of carelessness or mistake. At the worst, Judge Sanders is guilty of expunging the records by wilfully disregarding state statutes and the prior order of a fellow judge. In either case, she is guilty of conduct prejudicial to the administration of justice. We find that Judge Sanders committed conduct prejudicial to the administration of justice regarding count II.
¶ 47. Action must be taken to correct these improper expungements. This Court directs that Judge Sanders immediately vacate those orders granting the expungement of the Havards' records and give notice of such action to the Havards, the District Attorney for the Sixth Circuit Court District, and the Commission.

CODE OF JUDICIAL CONDUCT
¶ 48. The question remains as to whether the Commission was correct in finding that Judge Sanders violated Canons 1, 2 A, 2 B, 3 A(1), 3 A(2), 3 A(3), 3 A(4), and 3 B(1) of the Code of Judicial Conduct.
¶ 49. Canon 1 charges a judge to observe high standards of conduct and to uphold the integrity, as well as the independency, of the judiciary. Judge Sanders arrested, tried, and jailed Ferguson without benefit of due process. Ferguson was never Mirandized, nor was he allowed to contact a lawyer. He was jailed on a $500,000 cash appeal bond in direct contravention to state statutes.
¶ 50. Judge Sanders also illegally expunged the record of two criminal defendants. This illegal expungement was done after Senior Circuit Judge Johnson had denied the expungement based on state statutes.
¶ 51. A sitting judge is charged with knowing and carrying out the law of the state in which she sits. This disregard of state law, whether done intentionally or mistakenly, most certainly brings the integrity and independence of the office into question.
¶ 52. Canon 2 states that a judge should avoid both impropriety and the appearance of impropriety in all activities. Canon 2 A charges a judge to respect, as well as comply with, the law in all she does, thereby promoting public confidence in the integrity and impartiality of the judiciary.
¶ 53. Judge Sanders violated the law when she set bond for Ferguson at $500,000, in direct contravention to state statutes. She further violated the law by illegally expunging the record of two convicted felons. These actions erode the public's confidence in Judge Sanders' ability as a judge and further bring her integrity and impartiality into question.
¶ 54. Canon 2 B states that a judge should not allow herself to be influenced by outside forces. At the time of the incident involving Fred Ferguson, there was an ongoing dispute as to which judge, Judge Sanders or Judge Johnson, was the Senior Circuit Judge. Ferguson had obtained an Attorney General's opinion, based on state law, stating that Judge Johnson was the Senior Circuit Judge. Judge Johnson had also petitioned this Court for a ruling on the matter.
¶ 55. Judge Sanders allowed her personal feelings regarding the issue of the Senior Circuit Judgeship to cloud her professional judgment when dealing with Ferguson. It appears from the record that Judge Sanders allowed this incident to turn into a personal vendetta, with Ferguson being the unfortunate target.
¶ 56. Canon 3 charges a judge to be impartial and diligent in carrying out her duties. Canon 3 A(1) charges a judge to be faithful to the law and to ignore outside influences. Judge Sanders disregarded Sections 11-51-11 and 11-51-12 that set $2,000 as the maximum amount of bond that could be placed on a person charged with contempt.
*1071 ¶ 57. Canon 3 A(2) requires a judge to maintain order in her courtroom. Canon 3 A(3) charges a judge to act courteously to anyone in her courtroom and to expect the same behavior from others subject to her control.
¶ 58. Ferguson testified that during his telephone conversation with Judge Sanders regarding the disputed order that she became irate and threatened to have him arrested if he did not post the order. Judge Sanders admitted during the hearing that she was not calm during the telephone conversation.
¶ 59. Judge Sanders was totally lacking in patience and dignity during her confrontation with Ferguson. She had Ferguson arrested and brought before her court without being Mirandized and without the benefit of an attorney. When Ferguson invoked his right to silence, Judge Sanders had him jailed for criminal contempt under an exorbitant bond of $500,000.
¶ 60. Canon 3 A(4) requires a judge to allow anyone with a legal interest in a matter to be heard in her court. It further bars the judge from engaging in ex parte communications concerning a matter pending before her court. Judge Sanders failed to have Ferguson mirandized. This failure kept Ferguson, and any attorney he may have hired to represent him, from being heard at the hearing regarding the contempt charge against him.
¶ 61. In the matter regarding the illegal expungement of the criminal records, the State was not notified of the impending expungement. As a result, the State was not given an opportunity to be heard regarding the impending expungement.
¶ 62. Canon 3 B(1) charges a judge to diligently discharge all administrative responsibilities, as well as to maintain professional competence in administering judicial matters. Judge Sanders has failed to maintain professional competence in the matters at hand. She disregarded both state statutes and case law in ordering the arrest and imprisonment of Ferguson, as well as illegally expunging the records of the Havards.
¶ 63. Judge Johnson had previously denied the expungement requests of the Havards. In total disregard of this denial, Judge Sanders expunged the two records, in essence acting as an appellate judge. We therefore adopt the Commission's findings that Judge Sanders violated Canons 1, 2 A, 2 B, 3 A(1), 3 A(2), 3 A(3), 3 A(4), and 3 B(1) of the Code of Judicial Conduct.

III. WHETHER THE COMMISSION'S RECOMMENDATION THAT RESPONDENT BE FINED AND PUBLICLY REPRIMANDED IS SUPPORTED BY THE COMMISSION'S FINDINGS.
¶ 64. Section 177A of the Mississippi Constitution of 1890, as amended, provides that upon recommendation of the Commission, a judge may be removed, suspended, fined, publicly censured or publicly reprimanded by the Supreme Court. Rule 10 E of the Rules of the Commission on Judicial Performance states that the Supreme Court shall review the entire record then prepare a written opinion and judgment directing any disciplinary action it deems proper.
¶ 65. This Court is the trier of fact with the sole power to impose sanctions. Sanders, 708 So.2d at 877. We are not bound by the Commission's recommendation. However, we do give "great weight to the findings of the Commission, which has had the opportunity to observe the demeanor of the witnesses." Id.
¶ 66. The Commission has recommended the Circuit Court Judge Lillie Blackmon Sanders be publicly reprimanded, fined $3,000 and assessed the costs of this proceeding, $2,156.80. We are charged with examining the record in this case and determining if this is an appropriate sanction.
¶ 67. This Court has established factors by which it is determined whether a public *1072 reprimand is warranted. Id. We consider these factors as follows:
(1) The length and character of the judge's public service.
¶ 68. Judge Sanders has held the office of circuit court judge since 1995, with a temporary tenure as circuit court judge during part of 1989-1990. Judge Sanders was previously publicly reprimanded and fined in Mississippi Comm'n on Judicial Performance v. Sanders, 708 So.2d 866 (Miss.1998).
¶ 69. Philip West, a member of the Mississippi House of Representatives, testified on behalf of Judge Sanders. In his testimony Representative West stated that he knew Judge Sanders to be a fair, honest person of integrity. Judge Sanders offered 13 character affidavits into evidence at the hearing.
(2) Positive contributions made by the judge to the courts and community.
¶ 70. Representative West testified to Judge Sanders' involvement in her church and her sorority groups. He also testified that in his relationship with Judge Sanders during his service as president of the Adams County NAACP that he knew Judge Sanders (at that time Attorney Sanders) would be honest and provide needed legal advice and assistance.
(3) The lack of prior judicial precedent on the incident in issue.
¶ 71. As noted by the Commission in its recommendation, Judge Sanders acted in contravention of established case law and state statutes. She acted contrary to Purvis when she arrested and jailed Fred Ferguson. She further violated state statutes by setting bond for Ferguson at $500,000 when the statutory limit for such bond was $2,000. Judge Sanders also violated state statutes when she expunged the records of the Havards.
¶ 72. As a sitting judge, Judge Sanders is charged with knowing statutory as well as case law in areas in which she is to administer justice. The fact that she acted in knowing or careless indifference to these laws weighs heavily in favor of a public reprimand.
(4) Commitment to fairness and innovative procedural form on the part of the judge.
¶ 73. The incident involving Ferguson shows that Judge Sanders did not maintain the requisite level of fairness required of a judge. In order to avoid an appearance of impropriety and to comport with case law, another judge should have heard the case involving Ferguson.
(5) The magnitude of the offense.
¶ 74. Judge Sanders showed reckless indifference to the constitutional rights of Fred Ferguson. It is fundamental in our justice system that these rights be scrupulously guarded. For a sitting judge to ignore these rights renders meaningless the foundation of our judicial system. Such reckless indifference on the part of Judge Sanders weighs heavily in favor of public reprimand.
(6) The number of persons affected.
¶ 75. The incident involving Ferguson was witnessed by a great number of people, including deputy circuit clerks, the sheriff, a deputy sheriff, and Judge Sanders' court clerk. Such an incident is not one to be kept secret. It is with certainty that we can say the community at large eventually became aware of this incident, effectively undermining the integrity of the court.
(7) Whether "moral turpitude" was involved.
¶ 76. Moral turpitude was not involved.
¶ 77. We have stated that "[t]he sanction should recognize the misconduct, deter and discourage similar behavior, preserve the dignity and reputation of the judiciary and protect the public." Sanders, 708 So.2d at 877-78 (citations omitted). Judge Sanders was previously publicly reprimanded and fined for willfully disobeying state law. Id. at 878. Now, Judge Sanders is accused of the same offense: willfully disobeying state law.
*1073 ¶ 78. We have considered that removal from office, Mississippi Comm'n on Judicial Performance v. Jenkins, 725 So.2d 162, 170 (Miss.1998), and suspension from office without pay, Mississippi Comm'n on Judicial Performance v. Franklin, 704 So.2d 89, 94 (Miss.1997), are appropriate sanctions for the most egregious cases of judicial misconduct. However, given the facts of this case, including the provocation involved in the contempt dispute, we reject the Commission's recommendation that Judge Sanders be fined. Based upon the above analysis, this Court agrees with and adopts the Commission's recommendation that Judge Sanders should be publicly reprimanded and taxed with all costs of this proceeding ($ 2,156.80).

CONCLUSION
¶ 79. We adopt the Commission's finding that Judge Sanders violated the Code of Judicial Conduct and Miss. Const. Art. 6, § 177A by committing willful misconduct and conduct prejudicial to the administration of justice which brings the judicial office into disrepute regarding counts I and II. We agree with and adopt the Commission's recommendation as to the public reprimand and assessment of court costs. However, given the facts of this case, including the provocation involved in the contempt dispute, we reject the Commission's recommendation that Judge Sanders be fined. We further direct that Judge Sanders immediately vacate the orders of expungement granted to the Havards give notice of such action to Ronald Scott Havard, Gay Nell Havard, the District Attorney for the Sixth Circuit Court District, and the Commission.
¶ 80. CIRCUIT JUDGE LILLIE BLACKMON SANDERS IS HEREBY PUBLICLY REPRIMANDED FOR WILLFUL JUDICIAL MISCONDUCT AND CONDUCT WHICH BRINGS THE JUDICIAL OFFICE INTO DISREPUTE AND SHALL PAY ALL COSTS OF THIS PROCEEDING WITHIN 30 DAYS OF THE DATE OF THIS OPINION. THIS PUBLIC REPRIMAND SHALL BE READ IN OPEN CIRCUIT COURT IN EACH COUNTY OF THE SIXTH CIRCUIT COURT DISTRICT. JUDGE SANDERS IS DIRECTED TO VACATE IMMEDIATELY HER PRIOR ILLEGAL ORDERS EXPUNGING THE 1988 CRIMINAL CONVICTIONS OF RONALD SCOTT HAVARD AND GAY NELL HAVARD FOR MANUFACTURE OF A CONTROLLED SUBSTANCE AND TO GIVE NOTICE OF SUCH ACTION TO RONALD SCOTT HAVARD, GAY NELL HAVARD, THE DISTRICT ATTORNEY FOR THE SIXTH CIRCUIT COURT DISTRICT, AND THE MISSISSIPPI COMMISSION ON JUDICIAL PERFORMANCE.
PRATHER, C.J., SULLIVAN, P.J., BANKS, SMITH, MILLS, WALLER AND COBB, JJ., CONCUR. McRAE, J., DISSENTS WITH SEPARATE WRITTEN OPINION. SMITH, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.
McRAE, Justice, dissenting:
¶ 81. For reasons having to do with both a lack of evidence and a dearth of due process, I dissent. Furthermore, the majority assesses expenses and costs in the amount of $2156.80 on the recommendation of the Commission although the record is devoid of any proof, testimony, or documentation of any kind supporting this amount. The Commission, then, has not met its burden of proving these expenses and costs by clear and convincing evidence. The hearing is before us de novo. The Commission has had ample opportunity to supply this Court with evidence to sustain its recommendation of $2,156.80 in expenses and costs. Because it has not done so, the majority errs in adopting the Commission's recommendation. Finally, on the issue of the discovery denied to Judge Sanders concerning the race and sex of judges disciplined by the Commission, the majority fails to understand that the Commission, in its role as prosecutor, can not *1074 also be the judge with regard to whether the Commission should be compelled to produce evidence particularly when the Commission is the only entity with access to the information as a result of the information's confidential nature.

I.
¶ 82. First of all, there is insufficient evidence to support the Commission's findings of misconduct by clear and convincing evidence. Our review of judicial misconduct proceedings is de novo, and the findings must be supported by clear and convincing evidence. Mississippi Comm'n on Judicial Performance v. Jones, 735 So.2d 385, 386 (Miss.1999); Mississippi Comm'n on Judicial Performance v. Chinn, 611 So.2d 849, 850 (Miss.1992).
¶ 83. Insofar as the Ferguson matter is concerned, Ferguson was the clerk of the court, and it was his duty to file the orders of the circuit court judges. It was not his job to question the content of the orders given him by either judge. When Ferguson took it upon himself to decide which judge's orders to follow and which to ignore, he, in essence, judged the judges. The Commission specifically found that Ferguson did not post Judge Sanders's order nor did he mail a certified copy to the Secretary of State's office as required. Ferguson's blatant refusal to obey Judge Sanders's order was a sufficient basis for him to be found in contempt. Ladner v. Ladner, 206 So.2d 620, 622-23 (Miss.1968). Moreover, while not cited by the Commission, the record reveals that Ferguson hung up the phone on Judge Sanders when she called to inquire about her order not being filed or posted. When Ferguson was then summoned to court and questioned about the order, he admitted that he did not post the order, folded his arms, turned his back upon the court and refused to answer any further questions from the bench. Judge Sanders's response was certainly well within her discretionary power to preserve the dignity of the court. See Varner v. Varner, 666 So.2d 493, 496 (Miss.1995). Judge Sanders may have been confused regarding the distinctions between criminal and civil conduct, but this hardly merits a finding of misconduct by this Court. When judges make errors in their rulings, they can be reversed, not charged with ethical violations.
¶ 84. As to the expungement incident, the majority states that the judge should have had the file or looked at the file before signing the order. This is not consistent with what actually happens at the trial court level. At most, to the extent that this warranted any attention from this Court, it warranted only a private admonition.
¶ 85. Nor is there any authority in § 177A of the Mississippi Constitution for sanctioning Judge Sanders with the payment of $2,156.80 in costs including hotel expenses and other expenses incurred by members of the Commission. There is no itemization of the expenses, simply an order assessing an amount of $2,156.80. Why the rubber stamp? Sanctions not specifically authorized under § 177A may not be ordered. In re Branan, 419 So.2d 145 (Miss.1982). Travel expenses for members of the Commission are a most unusual expense, one that is not traditionally charged to litigants by this Court; the mere fact that they can be assessed only when the judge loses before the Commission acts as an incentive for members of the Commission to return a finding of guilt. In the case before us, Judge Sanders was apparently never given an itemized list of the costs nor was she ever given an opportunity to challenge the costs. In this respect, we give greater due process to our litigants in civil cases than we do to judges in disciplinary actions. Why?
¶ 86. There is no authority per § 177A of the Constitution, no statute or rule that specifies the costs to be assessed. Expenses for meals, lodging, and mileage are not the sort of costs typically awarded litigants in our courts. Nor do courts routinely award costs supported solely by *1075 the uncorroborated request of a litigant. The costs and expenses assessed in this case have not been proved by clear and convincing evidence, and we should not rubber stamp it where no testimony has been taken or documentation entered into the record in their support. The Commission failed in its burden to prove the expenses and costs, and the majority errs when it accepts the recommendation of the Commission to assess them in this case.

II.
¶ 87. Secondly, the procedures through which Judge Sanders has been found guilty of misconduct are seriously flawed. "Any discipline of a judge, even a reprimand, is a serious matter, and should be imposed only for substantial reasons and with all due process rights preserved." In re Voorhees, 739 S.W.2d 178, 180 (Mo. 1987). Our rules for disciplining judges as provided in § 177A and the Rules of the Mississippi Commission on Judicial Performance do not provide the due process that our federal and state constitutions require in matters as serious as this.
¶ 88. We have upheld the disciplinary process against challenges based on the fact that the Commission combines investigative, prosecutorial and adjudicative functions. Mississippi Comm'n on Judicial Performance v. Russell, 691 So.2d 929, 945 (Miss.1997). We have done so on the basis that the Commission does not adjudicate, but makes only "recommendations". Because it does not adjudicate, however, the Commission cannot rule on motions to dismiss, discovery motions or on whether the canons are arbitrary or capricious or void for vagueness. It is bound to follow them as written regardless of whether they are subject to several interpretations or are overly broad and vague. They then are to make a recommendation and submit it to this Court for approval or rejection per § 177A of the constitution of Mississippi of 1890.
¶ 89. The matter of the discovery requested by Judge Sanders highlights this flaw. The majority writes that Judge Sanders could have been given information possessed by the Commission as to the race and sex of judges accused of misconduct. Yet, because in the same opinion we adjudicate her case, she is given no forum in which to use the information belatedly provided by the Commission. At the very least, we should remand Judge Sanders's case to the Commission to give her an opportunity to put together her case on selective prosecution, if any.
¶ 90. Because the Commission itself has no power other than to recommend discipline, the Commission does not have the authority to adjudicate discovery motions and/or motions to dismiss. Nor should the Commission be in the business of refereeing disputes between the parties inasmuch as the Commission, in its investigatory role, is one of the parties to the proceeding. The Rules of the Mississippi Commission on Judicial Performance dictate that the Mississippi Rules of Civil Procedure shall apply but nowhere is there provided an impartial judge to arbitrate discovery matters and other disputes that may arise.
¶ 91. Without an impartial judge to decide discovery motions and the like, the Commission took it upon itself to deny Judge Sanders material that might prove harmful to the Commission's prosecution. If all prosecutors had the power to adjudicate disputes that may arise between themselves and the defense, there would be no need for our circuit court judges! Apparently all notions of due process are discarded when it comes to the disciplining of our judiciary. The Commission should not be in the business of deciding discovery disputes. It cannot impartially adjudicate and prosecute at the same time. Allowing the Commission to rule on disputes that arise between it and the judge accused of misconduct is akin to having the fox stand guard over the hen house. The Commission has no incentive to allow discovery of information that would weaken its case against the judge.
*1076 ¶ 92. The majority recognizes that a valid claim of selective prosecution can provide cause to dismiss. While selective prosecution may not be a defense on the merits, it, like other non-merits defenses such as statute of limitations and double jeopardy, may still require dismissal of the case. If the defendant can establish that the decision to prosecute was based on "an unjustifiable standard such as race, religion, or other arbitrary classification," Oyler v. Boles, 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962), then he has grounds for dismissal of the charges. See, e.g., United States v. Jones, 159 F.3d 969, 978 n. 8 (6th Cir.1998) ("our finding that Jones is entitled to discovery does not warrant a new trial, but only gives Jones the opportunity to move to dismiss the indictment following discovery").
¶ 93. The majority, however, opines that the statistics alone are insufficient to support Judge Sanders's need for the discovery. This result, while providing a facile solution for disposing of this case, ignores the reality that had Judge Sanders been given this information in a timely fashion she may have been able to prove a case of selective prosecution. Our criminal cases recognize that a defendant given belated discovery more often than not requires a continuance or even a mistrial in order to take full advantage of the discovery. See e.g. West v. State, 553 So.2d 8, 17-20 (Miss. 1989) (holding that a day's break was inadequate to cure prosecution's failure to disclose expert's surprise testimony regarding necrophilia). Again, we give less due process to judges accused of misconduct than we do every other citizen of this state. To hold, in essence, that Judge Sanders should have been able to build a case for selective prosecution before being given the essential tools for making a case for selective prosecution, i.e. the statistics held by the Commission, smacks of Alice's adventures through the looking glass. It makes no sense whatsoever. The majority allows the Commission to hide the statistics under an umbrella of confidentiality, allows the Commission to rule that it need not disclose the information, and then requires a judge to present an independently-made yet fully-fleshed case of selective prosecution before allowing a judge access to the Commission's statistics. If a judge were able to make the case that the majority requires of him or her to obtain the discovery, the judge would not need the discovery; her case would already be proven.
¶ 94. Another deficiency in the process is the fact that nowhere in § 177A is it contemplated that the Commission's duties shall be delegated to a three judge panel. Pursuant to the Rules of the Commission, however, cases are heard before a three-member panel. The panel deliberates and makes a recommendation to the entire seven-member body. Under this scheme, a majority of the Commission never sees a witness, never hears any testimony, and relies totally on the recommendation of a minority when deciding the professional fate of a respondent. Thus organized, the Commission is no more equipped to find facts than is an appellate court.
¶ 95. Furthermore, § 177A gives this Court the power to remove from office a judge who has been elected by the people of this state. Section 4 of the Voting Rights Act of 1965, codified at 42 U.S.C. § 1973b, requires federal preclearance prior to the implementation of any state-enacted laws or rules which affect the right or ability of persons to seek or hold elective office. See City of Rome v. United States, 446 U.S. 156, 160-61, 100 S.Ct. 1548, 1553-54, 64 L.Ed.2d 119 (1980); Dougherty County, Georgia, Bd. of Educ. v. White, 439 U.S. 32, 99 S.Ct. 368, 58 L.Ed.2d 269 (1978). According to 28 C.F.R. § 51.13(g)(1999), the Voting Rights Act applies to "[a]ny change affecting the eligibility of persons ... to become or remain holders of elective offices." Since Miss. Const. § 177A directly affects the right of elected judicial officials to "remain holders of elective offices," it is clear to me that § 177A and all related statutes and *1077 rules are subject to the requirements of the Voting Rights Act of 1965. Section 177A, then, necessarily affects the voting rights of citizens. For this reason, § 177A may not be enforced without its having been first precleared pursuant to Section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c.
¶ 96. Nor has the Code of Judicial Conduct, the rules governing the conduct of judges, been precleared under the Voting Rights Act. This code is the very basis for removal and sanctions of a judge who was elected under the constitution and which further provides for a means of removal through the impeachment process.
¶ 97. This is Judge Sanders's second appearance before this Court in a disciplinary matter; it is probable that the recommendation from the Commission on a third round, if any, would be to remove her from office. To the extent that a judge could be removed from office via § 177A,[1] both the constitutional provision and the code must be precleared.
¶ 98. Finally, the system, as presently constituted, places far too much power in the hands of the Executive Director. Under Rule 3 F of the Rules of the Mississippi Commission on Judicial Performance, the Executive Director's duties and responsibilities include the authority to:
(1) Represent the Commission as counsel in formal proceedings and in other proceedings, upon the direction of the Commission.
(2) Receive information from any proper source, including allegations and complaints;
(3) Prepare the Commission's budget for its approval and administer its funds;
(4) Make preliminary evaluations;
(5) Screen complaints and make recommendations to the Commission;
(6) Conduct and/or supervise investigations as directed by the Commission;
(7) Maintain and preserve in confidentiality the Commission's records, including all complaints, files and written dispositions;
(8) Maintain statistics concerning the operations of the Commission and make them available to the Commission and to the Supreme Court;
(9) Recommend employment and supervise other members of the Commission's staff;
(10) Prepare an annual report of the Commission's activities; and
(11) Employ, upon the direction of the Commission, special counsel, private investigators or other experts as necessary to investigate and process matters before the Commission and before the Supreme Court.
¶ 99. As a practical matter, the Executive Director acts as prosecutor before the Commission. Yet despite his adversarial role, he sets up the meetings and agenda of the Commission, decides which facts the Commission should consider, and "approves and administers" the Commission's funds. To make matters worse, he sits in on meetings when the Commission makes decisions, which is analogous to having a prosecutor sit in on a jury's deliberations. The Executive Director also acts as "court clerk" by issuing and signing all subpoenas. Further he advises the Commission of his preliminary investigation and counsels them as to which provisions of the Code of Judicial Conduct have been violated by a respondent judge. The Commission then votes and directs the Executive Director to prepare a formal complaint for the Executive Director to prosecute and have heard by the same Commission.
¶ 100. These procedural concerns are sufficiently significant to impeach the fairness *1078 of our judicial disciplinary process. For these reasons, I dissent.
NOTES
[1] We have removed judges in the past. See, e.g., Mississippi Comm'n on Judicial Performance v. Jenkins, 725 So.2d 162 (Miss.1998); Mississippi Comm'n on Judicial Performance v. Chinn, 611 So.2d 849 (Miss.1992); In re Kelly Collins, 524 So.2d 553 (Miss.1988).